Windsor v. Maxwell

(comment: 1)

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-272-CV

BEVERLY WINDSOR AND APPELLANTS

MORGAN WINDSOR 

V.

JOHN MAXWELL  APPELLEE

------------

FROM THE 393
RD
 DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

This is an appeal from an order granting John Maxwell, M.D.’s (“Dr. Maxwell”) motion to dismiss the medical malpractice lawsuit filed against him by appellants Beverly Windsor and Morgan Windsor (“the Windsors”).  The trial court dismissed the Windsors’ suit on the ground that they failed to provide an expert report meeting the requirements of article 4590i, section 13.01(d) of the Texas Medical Liability and Insurance Improvement Act (“the Act”).  
See
 
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(d) (Vernon Supp. 2003).  Because we conclude the trial court acted within its discretion in dismissing the case, we will affirm.

Factual and Procedural Background

On January 14, 1998 Beverly Windsor underwent a cerebral arteriogram (also sometimes referred to as an angiogram), a diagnostic procedure in which a catheter was inserted into her cerebral artery.  Dr. Maxwell, a neuro-radiologist, was Beverly Windsor’s treating physician.  The Windsors alleged in their suit that Ms. Windsor suffered an injury caused by Dr. Maxwell’s negligence when he used a wrong sized catheter during the procedure and when he failed to immediately withdraw the catheter at the onset of her nausea and vomiting.  An infarction injury (tissue death) allegedly occurred when the catheter severed Ms. Windsor’s cerebral artery and penetrated her brain.  The Windsors’ specific complaints were that Dr. Maxwell was negligent in failing to select an appropriate technique to perform the arteriogram, failing to obtain Ms. Windsor’s informed consent, failing to select an appropriate catheter, improperly positioning the catheter, injecting the catheter through the cerebral artery into her brain, failing to acknowledge and honor her withdrawal of consent during the procedure, and failing to assure proper placement of the catheter. 

In connection with their claim, the Windsors provided the report of Kendall M. Jones, M.D. (“Dr. Jones”), a board-certified radiologist, pursuant to article 4590i, section 13.01(d) of the Act.  We will emphasize in bold those areas of the report we deem pertinent to the causation question at issue in this appeal:

The patient has suffered the complication of an intimal injury to the left vertebral artery origin during a cerebral angiogram on 1/14/98.
  A subsequent MRI confirms the presence of additional cerebellar infarction (in addition to previously seen postoperative or post-hemorrhagic changes) on the left corresponding to the left vertebral artery injury.

. . . .

[T]he post-angiography report states that “multiple catheter exchanges were made to access the left vertebral [artery].”  However, the number of catheter exchanges is not given.  
The risk of vascular injury rises with each new attempt and with prolonged procedure time, particularly after one hour of catheter use.
  When the vertebral artery cannot be accessed, the subclavian artery can be safely injected.  

Finally, it was stated that the patient developed nausea and vomiting, and that the catheter was subsequently removed from the vertebral artery.  The patient reports a delay in the removal of the catheter.  Removal in such cases should be immediate, since nausea and vomiting are clear warnings of vertebral ischemia.  The delay in removing the catheter is below the standard of care. In addition, the patient withdrew consent and requested termination of the procedure, and in this case the procedure should have been terminated immediately.  The patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, with subsequent infarction documented above
.  The fact that the patient withdrew consent and the procedure continued with subsequent complications, is indicative that the actions by Dr. Maxwell did indeed fall below the standard of care.  

The appropriate standard of care for a cerebral angiogram would be to immediately remove a cerebral catheter at the onset of nausea and vomiting, which are indicative of vertebral ischemia.  In addition, it is the standard of care to discontinue a procedure when the patient has verbally withdrawn consent.  It is therefore, my opinion that Dr. Maxwell fell below the standard of care exercised by a reasonable and prudent radiologist in similar circumstances. [Emphasis added.]

At the conclusion of the hearing on Dr. Maxwell’s motion to dismiss, the trial court made the following statement in connection with its order granting the motion: “Plaintiffs’ Expert Report failed to meet the requirements of Art. 4590i, § 13.01(r)(6) by failing to provide the causal relationship between the alleged failure and the injury, harm or damages claimed.”

The Windsors present three issues on appeal: (1) the trial court erred in granting Dr. Maxwell’s motion to dismiss on the basis that their expert report failed to provide the causal relationship between the alleged failure and the injury; (2) the trial court abused its discretion in granting Dr. Maxwell’s motion to dismiss because the expert report correctly informed Dr. Maxwell of the specific conduct the Windsors called into question and because the report provided a basis to conclude the Windsors’ claims have merit; and (3) the trial court erred in granting the motion to dismiss because there was sufficient evidence supporting the Windsors’ claims of assault and battery, which involved matters of common knowledge by laymen, thus removing the requirement of compliance with any medical malpractice statute.  

 
Expert Reports Under The Act

We begin our analysis with a review of the Act’s requirements. Medical-malpractice plaintiffs must provide each defendant physician and health care provider an expert report with the expert's curriculum vitae.  
See
 
Tex. Rev. Civ. Stat. Ann.
 art. 4590i, § 13.01(d); 
Am. Transitional Care Ctrs., Inc. v. Palacios
, 46 S.W.3d 873, 877 (Tex. 2001).  The report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(r)(6).  If a plaintiff timely files an expert report and the defendant moves to dismiss a claim because of the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in subsection (r)(6) of this section."  
Id
. § 13.01(
l
).

The supreme court analyzed these statutory requirements in 
Palacios
, 46 S.W.3d at 877-80.  There the court explained that, when considering a motion to dismiss under section 13.01(
l
), "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report."  
Id
. at 878.  To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes:  (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. 
Id.
 at 879.

The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners.  
Id. 
at 878.  The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies:  standard of care, breach, and of critical import to the instant appeal, the causal relationship.  
Id.
  A report cannot merely state the expert's conclusions about these elements.  
Id. 
at 879.  "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."  
Earle v. Ratliff
, 998 S.W.2d 882, 890 (Tex. 1999).

We review a trial court's order dismissing a claim for failure to comply with section 13.01(d)'s expert-report requirements under an abuse of discretion standard.  
Palacios
, 46 S.W.3d at 878.  A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985).  When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment.  
See Flores v. Fourth Court of Appeals
, 777 S.W.2d 38, 41 (Tex. 1989)(orig. proceeding).

The Challenge To The Windsors’ Report

Dr. Maxwell did not dispute that the expert report fairly summarized the alleged standard of care. 
 See
 
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(r)(6).  Nor did he dispute that the report fairly summarized how he allegedly breached the standard of care. 
 See id
.  Dr. Maxwell only contested in the trial court whether the report fairly summarized the causal relationship between his alleged breach and Ms. Windsor’s injury. 
 See
 
id
.; 
Palacios
, 46 S.W.3d at 879.

Citing the supreme court’s recent decision in 
Bowie Memorial Hospital v. Wright
, 79 S.W.3d 48 (Tex. 2002), Dr. Maxwell contends that the trial court acted within its direction in determining that the report failed to reflect the causal link required by the Act.  

In 
Wright
, the plaintiff suffered fractures in her right knee and foot in a car accident and sued for damages when the Bowie Memorial Hospital physician's assistant who took her x-rays either misplaced or misread the foot x-ray and, therefore, did not discover the fracture in the right foot.  
Id.
 at 50. The fracture was discovered a month later and required the plaintiff to undergo two surgeries over ten months. 
 Id.
  The plaintiff complained that if the physician's assistant had diagnosed her fractured foot earlier she "probably would have had a better outcome."  
Id.
 at 51.  To establish a causal relationship between her breach of the standard of care and her injury, the plaintiff relied on one statement in her expert report:  "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [plaintiff] would have had the possibility of a better outcome."  
Id.
 at 52-53.  The plaintiff contended that this statement "explains why [plaintiff’s] damages were caused by [defendant’s] breach." 
 Id.
 at 53.

The supreme court held that the report's conclusory statement that the plaintiff might have had "the possibility of a better outcome" did not constitute a good faith effort to comply with the statute's causation requirement because it did not provide information linking the expert's conclusion that the plaintiff might have had a better outcome to the defendant’s failure to correctly read and act upon the x-rays, i.e., the report failed to explain how the defendant’s conduct caused further injury to the plaintiff.
  Id.  
The court viewed the report as conclusory and held “[a] conclusory report does not meet the Act's requirements, because it does not satisfy the 
Palacios
 test." 
 Id.

No Causal Link Between The Injury And The

Alleged Use Of A Wrong Sized Catheter

The Windsors claim in their pleadings that Dr. Maxwell was negligent in failing to select an appropriate sized catheter for the arteriogram procedure.  Nothing in Dr. Jones’ report indicates the catheters used in the procedure were of an inappropriate size or that the size selection in any manner caused Ms. 

Windsor’s injury.  Dr. Jones merely noted that “multiple catheter exchanges were made” and that the “risk of vascular injury rises with each new attempt and with prolonged procedure time.”  Dr. Jones also noted that he was unaware of the number of catheter exchanges made during the procedure.  Lacking any connection between the intimal injury and the Windsors’ pleaded cause of action alleging use of a wrong sized catheter, we cannot say the trial court abused its discretion in granting Dr. Maxwell’s motion.  
See
 
Wright
, 79 S.W.3d at 53.

No Causal Link Between The Injury And The Alleged

Failure To Timely Withdraw The Catheter

In addition to claiming Dr. Maxwell used an inappropriate sized catheter, the Windsors also alleged in their pleadings that Dr. Maxwell used an improper “technique” during the arteriogram and that he breached the requisite standard of care when he continued with the procedure after Ms. Windsor withdrew consent.

Dr. Jones stated in his report that arterial injuries, including intimal injury, are known complications of cerebral angiography, but he never set forth in the report a causal connection between the technique chosen by Dr. Maxwell, his failure to discontinue the procedure immediately upon Ms. Windsor’s request, and the intimal injury she suffered.  The Texas Supreme Court has stated that the report’s adequacy does not depend on whether the expert uses any particular “magical words.”  
Wright
, 79 S.W.3d at 53.  It is sufficient that the report contains information summarizing and explaining the causal relationship between the doctor’s failure to meet the applicable standards of care and the plaintiff’s injury. 
 Id.  
Here, however, the closest Dr. Jones came to voicing an opinion on the issue of causation is contained in one sentence of the report: “[t]he patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, with subsequent infarction documented above.”

We believe there are at least two reasons why the trial court, in its discretion, could have properly concluded this sentence was insufficient to explain the requisite casual connection between the injury and Dr. Maxwell’s conduct.  First, it is not clear from the final clause of the sentence that Dr. Jones was even attempting to insinuate that he believed a casual connection existed between the failure of Dr. Maxwell to immediately end the arteriogram  and the intimal brain injury.  The sentence can reasonably be read as only relating that Ms. Windsor had “reported” two things to Dr. Jones:  (1) she withdrew consent during the procedure; and (2) the procedure continued, with subsequent infarction (tissue death).  In other words, the sentence could reasonably be interpreted as intending to mean only “the patient told me that she withdrew consent and told me that the infarction occurred after Dr. Maxwell refused to honor that request.”  Under this interpretation, it cannot be inferred from the report that Dr. Jones or Ms. Windsor believed the injury was caused by Dr. Maxwell’s failure to immediately withdraw the catheter.  A mere statement by the patient that her injury followed the withdrawal of consent does not suffice to establish the explanation of causation requirement for reports under the Act.  
See Ratliff
, 998 S.W.2d at 890 (noting the expert must explain the basis of “his statements” linking “his conclusions” to the facts).
(footnote: 1)
 The dissent apparently misunderstands the import of this analysis.  We do not mean to suggest that when drafting the report a plaintiff’s medical expert cannot make logical inferences from statements made to the expert by the plaintiff or that the plaintiff must “prove a fact”–here that the infarction occurred after withdrawal of consent; only that the Act requires that the 
causal connection
 in the report be set forth and explained by the expert doctor.  In other words, a report would not be sufficient under the Act if, on the question of causation, the doctor merely stated “the patient told me that the defendant physician caused her injury,” because the Act requires an explanation linking the basis of the 
expert’s
 conclusions to the facts.
  See Ratliff
, 998 S.W.2d at 890.  Nor would a report be sufficient if it merely states, as related here, that the injury followed the act.  Here, evidence that the infarction occurred after the catheter remained in the artery does not establish that maintaining the catheter in the artery 
caused
 the artery to be pierced, much less explain that causation, as required by the Act.
(footnote: 2)  

To the extent the sentence might alternatively be read to infer that what Dr. Jones was really attempting to articulate is a conclusion that there existed a casual connection between the injury and the failure to immediately cease the procedure following withdrawal of consent, we must honor the Texas Supreme Court’s directive that trial court orders granting dismissals under the Act be reviewed under an abuse of discretion standard, under which reviewing courts are
 
not
 
to interpret the report in the light most favorable to the nonmovant (here, the Windsors), but instead look to whether the trial court acted in an unreasonable manner without reference to any guiding rules or principles. 
 Wright
, 79 S.W.3d at 52-53; 
see also Palacios
, 46 S.W.3d at 877 (directing reviewing courts 
not
 to indulge in reasonable inferences in favor of the nonmovant).  Therefore, even if a reasonable inference might be drawn that Dr. Jones was really attempting to articulate in the sentence in question a conclusion on causation, we do not hold the trial court acted unreasonably and without reference to any guiding principles in failing to draw that inference.

Even had the trial court inferred from the report that Dr. Jones believed Ms. Windsor’s intimal injury was caused by Dr. Maxwell’s failure to end the procedure upon withdrawal of her consent, Dr. Jones’ statement “[t]he patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, with subsequent infarction documented above[,]” at best, amounts to only a mere conclusion on causation because it does not explain how continuance of the procedure caused the infarction.  In order for his report to establish the requisite casual link, Dr. Jones was required to explain, in some manner, how the failure to immediately withdraw the catheter caused the injury.  
See Wright
, 79 S.W.3d at 52.  A conclusory report does not meet the Act’s requirements, because it does not satisfy the 
Palacios
 test.
  Id.
 (citing 
Palacios
, 46 S.W.3d at 879).  We therefore hold the trial court acted within its discretion in dismissing the Windsors’ claim.
(footnote: 3)  

The dissent concludes that Dr. Jones’ report was sufficient to establish a causal link between Dr. Maxwell’s conduct and a general injury to the cerebellum caused by “reduced blood flow through the artery being catheterized.”  One problem with this conclusion is that the Windsors have not alleged a general injury caused by reduced blood flow through the artery being catheterized.  Instead, the Windsors allege that Ms. Windsor’s brain infarction injury was caused when Dr. Maxwell, using a wrong sized catheter, “pierced her cerebral artery with the catheter during the procedure” and that he “forced the catheter too far severing the cerebral artery” and entering her brain.
(footnote: 4)  Another problem with the dissent’s analysis is that even if the Windsors had pleaded the injury the dissent believes was described in Dr. Jones’ report, the report does not explain, in any manner, a causal link between Dr. Maxwell’s conduct and the injury. 

The dissent’s belief that the expert report need not support the specific theory of negligence alleged in a plaintiff’s written pleadings is based on a misinterpretation of the language in 
Palacios
 providing that “the only information relevant to the [trial court’s] inquiry is within the four corners of the document.” 
 Palacios,
 46 S.W.3d at 878.  That statement was made by the Texas Supreme Court in connection with its analysis of an argument that the trial court should be required to look to other evidence outside the report in the event it concludes the report does not provide the fair summary required under the Act, an idea the court squarely rejected.  The court clearly did not mean to suggest by this language that the trial court was required to ignore the plaintiff’s pleadings when conducting its review of the doctor’s report, particularly in light of the court’s subsequent notation in
 Palacios
 that “the report must inform the defendant of the specific conduct the plaintiff has called into question.”  
Id.
 at 879.  To inform the defendant of the specific conduct the plaintiff has called into question, the report 
must support the cause of action alleged by the plaintiff in its pleadings.  To hold otherwise would lead to easily imagined absurd results.  Issues one and two are overruled.  

The Windsors’ Remaining Theories Of Negligence

To the extent that the Windsors’ remaining pleaded acts of negligence (failure to use an appropriate technique, improperly positioning the catheter, improper penetration of the catheter, and failure to assure proper placement of the catheter) constitute theories of negligence outside the theories discussed above, the trial court’s dismissal for non-compliance with the Act’s causation  explanation is wholly supported.  Nowhere in the expert report tendered by the Windsors are those theories of negligence addressed. 

We do not reach the merits of the Windsors’ argument in issue three that an assault and battery claim need not be supported by an expert report under the Act because, as correctly noted by Dr. Maxwell on appeal, the Windsors did not plead a cause of action for assault and battery.  Issue three is overruled and 
the trial court’s judgment is affirmed.

DAVID L. RICHARDS

JUSTICE

PANEL A: HOLMAN AND WALKER, JJ.; and DAVID L. RICHARDS, J. (Sitting by Assignment).

WALKER, J. filed a dissenting opinion.

DELIVERED: August 27, 2003

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-272-CV

BEVERLY WINDSOR AND APPELLANTS

MORGAN WINDSOR

V.

JOHN MAXWELL APPELLEE

------------

FROM THE 393
RD
 DISTRICT COURT OF DENTON COUNTY

------------

DISSENTING OPINION

------------

I.  Introduction

I respectfully dissent.  The analytical framework utilized by the majority is contrary to the plain language of article 4590i, section 13.01(
l
) and ignores controlling supreme court case law.  I believe that Dr. Jones’s report, properly examined against the benchmark, guiding principles of good faith—that the report contain information sufficient to apprise the defendant of the claims against him and to permit the trial court to conclude the claims have merit—is clearly adequate.
(footnote: 5)  Consequently, I would hold that the trial court abused its discretion by dismissing the Windsors’ health care liability claim against Dr. Maxwell and would reverse the trial court’s order of dismissal.

II.  An Expert Report Need not Correlate to Pleaded

Acts of Negligence to Constitute a Good Faith Effort

The Windsors pleaded:

Cause of Action

Defendants [sic] failed to meet the minimum standard of care and provided substandard medical care and was negligent to Plaintiffs [sic] as follows:

(A) failing to select an appropriate technique to perform the arteriogram and failing to obtain an informed consent;

(B) failing to select an appropriate catheter;

(C) improperly positioning the catheter;

(D) injecting the catheter through the cerebral artery into plaintiff’s brain;

(E) failing to acknowledge and honor the plaintiff’s withdrawal of her consent; and

(F) failing to assure proper placement of the catheter;

Each of the above stated negligent acts was the direct and proximate cause of Plaintiff’s damages.

The majority, instead of looking to the four corners of Dr. Jones’s report to determine whether it constitutes a good faith effort at compliance with article 4590i, section 13.01(r)(6)’s definition of an expert report, inexplicably, sua sponte, juxtaposes the Windsors’ pleaded acts of negligence with Dr. Jones’s report.  
Cf. Bowie Mem’l Hosp. v. Wright, 
79 S.W.3d 48, 53 (Tex. 2002) (explaining, “We have held that the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself.”); 
Am. Transitional Care Ctrs., Inc. v. Palacios
, 46 S.W.3d 873, 878 (Tex. 2001)
 
(interpreting the statute as requiring courts to look only to the report to determine adequacy—“Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.”).  The majority looks to specific negligent acts pleaded by the Windsors and then reviews Dr. Jones’s report to see if the Windsors have come forward with a causation opinion from Dr. Jones on the pleaded acts of negligence.  
Concluding that Dr. Jones’s report contains no causal link between Mrs. Windsor’s injury and the negligent acts pleaded by the Windsors, the majority then holds that Dr. Jones’s report does not constitute a good faith effort at compliance with section 13.01(r)(6)’s definition of an expert report.  
See
 
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(
l
), (r)(6) (Vernon Supp. 2003).

The majority’s analysis of section 13.01's good faith requirement is flawed.  First, the majority’s use of the Windsors’ pleadings to measure whether Dr. Jones’s report constitutes a good faith effort turns Texas pleading practice on its head.  The Windsors pleaded a single health care liability negligence claim against Dr. Maxwell—alleging that he negligently performed Mrs. Windsor’s January 14, 1998 arteriogram.  
See, e.g., Lampasas v. Spring Ctr., Inc
., 988 S.W.2d 428, 436 (Tex. App—Houston [14
th
 Dist.] 1999, no pet.) (recognizing that amended pleadings simply adding factual variations of negligence claim did not preclude no-evidence summary judgment because amendment did not constitute new theory of recovery).  The Windsors did not need to plead any specific acts of negligence by Dr. Maxwell in the absence of special exceptions.  
See
 
Tex. R. Civ. P. 
45(b), 47(a), 48; 
see also
 
Boyles v. Kerr
, 855 S.W.2d 593, 601 (Tex. 1993) (op. on reh’g) (recognizing that the actual cause of action and the elements do not have to be pleaded with specificity; it is sufficient if a cause of action can be reasonably inferred).  The Windsors could simply have pleaded that Dr. Maxwell negligently performed the arteriogram on Mrs. Windsor on January 14, 1998 and that his negligence in performing the arteriogram proximately caused Mrs. Windsor to suffer a brain injury leaving her with permanent physical impairment and other damages.  
See Roark v. Allen
, 633 S.W.2d 804, 809 (Tex. 1982) (rejecting argument that plaintiff must specifically plead negligent use of forceps and upholding judgment based on simple negligence pleading)
.

Although the factual acts of negligence pleaded by a plaintiff—especially in an original petition before discovery—are not in any way binding or limiting on the plaintiff, the majority for no apparent reason fixates on the Windsors’ pleaded acts of negligence in measuring the adequacy of Dr. Jones’s report.  Via this analysis, the majority departs from the statutory requisites for a good faith effort at compliance with section 13.01(r)(6)’s definition of an expert report and from controlling supreme court case law.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(
l
), (r)(6); 
Palacios
, 46 S.W.3d at 878.  Utilizing this unconventional procedure, akin to a trial court’s consideration of a no-evidence motion for summary judgment, the majority then concludes that the Windsors did not come forward with a report addressing causation concerning their specifically pleaded negligent acts so the trial court did not abuse its discretion in dismissing with prejudice the Windsors’ suit against Dr. Maxwell.

The plain language of article 4590i, section 13, however, nowhere requires an expert’s report to correlate with or support factual negligent acts pleaded by a claimant in a single health care liability claim.  The focus of the statute is on claims, not on the variety of factual negligent acts asserted within a single claim.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(d), (r)(2).  Moreover, one purpose of the expert-report requirement is to deter frivolous claims, not to supplant current pleading practice.  
Accord Palacios, 
46 S.W.3d at 877-78 (explaining purpose of expert-report requirement is to deter frivolous claims).  Thus, a claimant may simply plead that a health care provider was negligent in the performance of some procedure, that his negligence proximately caused injuries to the claimant, and that as a result the claimant has suffered damages in excess of the jurisdictional limits of the court.  
See
 
Tex. R. Civ. P. 
45, 47, 48.  The claimant’s expert report would then necessarily be more specific than the claimant’s general pleading.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(r)(6).  Or, a plaintiff may, as the Windsors, plead specific, sometimes alternative factual negligent acts within a single negligence cause of action.  
See
 
Tex. R. Civ. P. 
45, 47, 48.  That a claimant’s expert report or reports may or may not address every or any of the specifically pleaded acts of negligence set forth in the petition is simply of no import.  Instead, courts are to look solely to the four corners of the report to determine whether it constitutes a good faith effort at compliance.  
Palacios
, 46 S.W.3d at 878 (holding that “a trial court should look no further than the report in conducting a section 13.01(
l
) inquiry”).  The claimant’s pleadings are relevant to a determination of the adequacy of an expert report only to the extent that the defendant must be sued to trigger a report due-date, and the plaintiff must be asserting a health care liability claim to necessitate a report.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(a), (d) (setting report due-dates); 
Rogers v. Crossroads Nursing Serv., Inc.
, 13 S.W.3d 417, 418-19 (Tex. App.—Corpus Christi 1999, no pet.) (recognizing article 4590i applies only to health care liability claims).  I cannot agree with the majority that anything in the statute or in existing case law authorizes the analysis the majority engages in today—a comparison between pleaded factual acts of negligence and causation expressed within an expert report concerning those pleaded acts of negligence to determine the adequacy of an expert report.
(footnote: 6)
III.  Dr. Jones’s Report, Under the Statute and Guiding Principles,

Constitutes a Good Faith Effort

Dr. Maxwell challenged only the causation element of Dr. Jones’s report.  Article 4590i, section 13.01(r)(6) requires that an expert report provide a fair summary of the causal relationship between the defendant health care provider’s negligence and the injury, harm, or damages claimed.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(r)(6).  A court may dismiss a claim based on the inadequacy of an expert report concerning causation only if the report does not constitute a good faith effort 
to provide a fair summary of the expert's causation opinions.  
Id
. § 13.01(e)(3), (
l
), (r)(6); 
see Bowie Mem’l Hosp., 
79 S.W.3d at 52;
 Palacios
, 46 S.W.3d at 878.  An expert report constitutes a good faith effort if it provides enough information to inform the defendant of the specific conduct the plaintiff has called into question and provides a basis for the trial court to conclude that the claims have merit.  
Palacios, 
46 S.W.2d at 879.  Moreover, a plaintiff need not present evidence in the report as if it were actually litigating the merits.  
Id.
  The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial.  
Id.
 

Here, Dr. Jones’s report is two and one-half pages, single spaced.  The report indicates that Dr. Jones reviewed specific past and present medical records of Mrs. Windsor.  Dr. Jones’s report also specifically states that he reviewed an affidavit made by Mrs. Windsor.
(footnote: 7)  Mrs. Windsor underwent a MRI on January 12, 1998, and Dr. Jones reviewed that report.  The procedure at issue, a cerebral angiogram, was performed by Dr. Maxwell on Mrs. Windsor on January 14, 1998.  Dr. Jones’s report factually notes the problems with the January 14, 1998 procedure:

The left vertebral artery was reportedly accessed but the catheter was reportedly removed following onset of nausea and vomiting, findings suggestive of vertebral artery distribution [i]schemia.  The report [Dr. Maxwell’s operative report] states that “multiple catheter exchanges were made to access the left vertebral anteriogram” [sic].  Intravascular heparin and “anti-vasospasm” therapy was begun, and a left subclavian arteriogram demonstrated a small intimal injury near the vertebral origin. Reduced flow was subsequently noted in the left vertebral artery.

Dr. Jones’s report then goes on to explain:

An additional MRI brain dated 1/26/98, consisting of sagittal and axial T1-weighted, axial proton density and T2-weighted and MR angiography of the carotid bifurcation again shows [the same findings as the 1/12/98 MRI]. 
There are smaller areas of abnormally increased T2 signal in the left posterior cerebellar white matter and medial left cerebellar cortex, consistent with cerebellar infarct which appears new from the prior MR brain of 1/12/98.  
[Emphasis added.]

Under the “Opinions” heading of his report, Dr. Jones explains, “The patient has suffered the complication of an intimal injury to the left vertebral artery 
origin during a cerebral angiogram on 1/14/98.
  A subsequent MRI confirms the presence of 
additional cerebellar infarction
 . . . on the left 
corresponding to the left vertebral artery injury
.” [Emphasis added.]

Thus, Dr. Jones’s report makes it clear that he compared a January 12, 1998 MRI of Mrs. Windsor’s brain and a January 26, 1998 MRI of Mrs. Windsor’s brain and saw a “new” intimal injury to the left vertebral artery and cerebellar infarction corresponding to the vertebral artery injury on the January 26
th
 MRI that did not appear on the January 12
th
 MRI.  Dr. Jones even opined that these injuries occurred “during a cerebral angiogram on 1/14/98,” i.e., the procedure performed by Dr. Maxwell.  Thus, the report clearly outlines physical tests documenting and confirming the “claimed injury,” i.e., an intimal injury to the left vertebral artery and a cerebellar infarction corresponding to the vertebral artery injury, occurring during the procedure performed by Dr. Maxwell.

Dr. Jones’s report explained that Mrs. Windsor developed nausea and vomiting during the procedure, a sign of vertebral ischemia.
(footnote: 8)  Mrs. Windsor swore in her affidavit that at this point she withdrew consent for the procedure and told Dr. Maxwell to stop.  Mrs. Windsor swore that nevertheless Dr. Maxwell did not stop and continued on with the procedure until she was vomiting uncontrollably and lost control of her bowels.  Dr. Jones’s report opines:

The patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, with subsequent infarction
(footnote: 9) documented above.  The fact that the patient withdrew consent and the procedure continued with subsequent complications, is indicative that the actions by Dr. Maxwell did indeed fall below the standard of care.

Accordingly, Dr. Jones’s report summarizes:  that during the January 14, 1998 cerebral arteriogram Mrs. Windsor suffered an intimal injury—here a puncture wound—to her left vertebral artery, the artery Dr. Maxwell had the catheter inserted into;
(footnote: 10) that Mrs. Windsor began suffering an inadequate blood flow, ischemia, through that artery, and as a result experienced nausea and vomiting; that Mrs. Windsor asked Dr. Maxwell to stop the procedure; that the standard of care is to stop the procedure immediately when the patient experiences nausea or vomiting or requests that the procedure be stopped; that Dr. Maxwell failed to stop the procedure when Mrs. Windsor experienced nausea and vomiting and requested that it be stopped; and that because Dr. Maxwell refused to stop the procedure the inadequate blood flow to Mrs. Windsor’s cerebellum through the vertebral artery continued and she suffered a “cerebellar infarction,” i.e., tissue damage, “corresponding to the left vertebral artery injury.”  I would hold that this information, conveyed in Dr. Jones’s report, provides a fair summary of the causal relationship between Dr. Maxwell’s negligence—failing to stop the procedure upon withdrawal of consent and upon nausea and vomiting, both signs of intimal injury induced vertebral ischemia, i.e., reduced blood flow through the vertebral artery—and the injury claimed by Mrs. Windsor—a “cerebellar infarction” “corresponding to the left vertebral artery injury” and “subsequent infarction documented above,” i.e., MRI-documented cerebral brain tissue death.  This information is sufficient to inform Dr. Maxwell, or any other medical professional reading the report, of the specific claims against Dr. Maxwell and is certainly sufficient to permit the trial court to conclude that the Windsors’ claims have merit.
(footnote: 11)  Consequently, Dr. Jones’s report constitutes a good faith effort at compliance with article 4590i, section 13.01(r)(6).  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(r)(6).

Dr. Jones’s report does not simply recite, as the majority contends, that Mrs. Windsor’s cerebral infarction merely followed Dr. Maxwell’s procedure but was not “caused” by the procedure.  Dr. Jones’s report utilizes specific causative words, explaining that Mrs. Windsor suffered a “cerebellar infarction . . . on the left 
corresponding
 to the left vertebral artery injury.”  He explains that “The patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, 
with  subsequent infarction documented above
.”  The adequacy of Dr. Jones’s report does not depend on whether he expressed causation using particular magic causation words.  
See Bowie Mem’l Hosp.
, 79 S.W.3d at 53.  The causation words Dr. Jones chose are common to the medical field, are sufficient to apprise Dr. Maxwell of the causation element of the Windsors’ claim
(footnote: 12) and to allow the trial court to conclude that the Windsors’ claim has merit.

Moreover, the majority’s holding that Dr. Jones’s report fails to explain “how continuance of the procedure caused the infarction,” overlooks the causative medical aspect inherent in an infarction.  An infarction, tissue death, is by definition always physically caused by ischemia, an insufficient quantity of oxygenated blood reaching an organ or tissue until tissue death results, just as a broken arm is by definition always physically caused by excessive forces brought to bear on the arm bone.  Here Dr. Jones explained the “cause” of Mrs. Windsor’s continued ischemia: Dr. Maxwell’s failure to stop the procedure despite the increasingly severe symptoms of ischemia Mrs. Windsor was experiencing.  He explained that the standard of care is to immediately stop the procedure upon the occurrence of these symptoms of ischemia, and noted that Dr. Maxwell did not stop, “with subsequent infarction documented above.”  Any physician reading the report would have no doubt that Mrs. Windsor suffered an intimal injury to the left vertebral artery (here, a puncture wound to the artery being catheterized); she began suffering vertebral ischemia (reduced blood flow through the artery being catheterized) during the procedure;
(footnote: 13) that no action (i.e., termination of the procedure and removal of the catheter) was taken to alleviate the ischemia; and that as a result a full-blown cerebral infarction (inadequate blood flow and resultant tissue death documented by a subsequent MRI) in the area served by the artery occurred.  Continuation of the cerebral angiogram in light of increasingly severe symptoms of ischemia caused the subsequent infarction just as increasing physical force on an arm bone will cause it to break.  Based on the medical facts here, it is unnecessary to require, as the majority does, Dr. Jones to state “how continuation of the procedure caused the infarction” just as it would be unnecessary to require a doctor to state how continued application of force to an arm bone caused it to break.  Bones break when exposed to excessive force.  Tissue dies when deprived of adequate oxygenated blood.  Dr. Maxwell failed, even when Mrs. Maxwell suffered increasingly severe symptoms of oxygen deprivation to her brain, to halt the procedure and alleviate the oxygen deprivation, causing tissue death in Mrs. Windsor’s brain.  The causation facts and opinion in Dr. Jones’s report render it a good faith effort at compliance with section 13.01(r)(6)’s expert report requirement concerning causation.

Finally, I cannot agree with the majority’s analysis of Dr. Jones’s statement, “The patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, 
with subsequent infarction documented above
.”  The majority asserts that it is possible to give two different meanings to this statement:  it may simply be a factual statement reported by Mrs. Windsor to Dr. Jones that the infarction occurred after she withdrew her consent, or it may be Dr. Jones’s opinion that the infarction occurred after Mrs. Windsor withdrew her consent.  The issue is settled, however, in the very next sentence of Dr. Jones’s report where he states, “The fact that the patient withdrew consent 
and the procedure continued with subsequent complications
, is indicative that the actions by Dr. Maxwell did indeed fall below the standard of care.”  Although this statement addresses the standard of care issue, it also clarifies Dr. Jones’s meaning in the prior sentence.  It clarifies that it is Dr. Jones’s opinion that the procedure continued with subsequent complications.  A sentence in an expert report may address both causation and standard of care.  No one-element-per-sentence rule exists.  Dr. Jones could have simply stated that continuance of the procedure after the patient withdrew consent violated the standard of care.  But he didn’t.  He incorporated and adopted as his opinion that the “procedure continued with subsequent complications.”

A trial court abuses its discretion when it misapplies the law to the facts. 
Walker v. Packer
, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) (holding, “A trial court has no ‘discretion’ in determining what the law is or applying the law to the facts.”).  A trial court also abuses its discretion when it makes a choice that is legally unreasonable in the factual-legal context in which it is made.  W. Wendall Hall, 
Standards of Review in Texas
, 34 
St. Mary’s L. J. 
1, 15-16 (2002).  The trial court is required under section 13.01(
l
), 
Bowie Memorial Hospital
, and 
Palacios
 to view the entire report in assessing its adequacy.  
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(
l
) (requiring trial court to examine report to see if it represents good faith effort to comply with the definition of an expert report); 
Bowie Mem’l Hosp.
, 79 S.W.3d at 53 (explaining trial court should review information within four corners of report); 
Palacios
, 46 S.W.3d at 878 (holding trial court should look to four corners of report in conducting 13.01(
l
) inquiry).

The construction of the sentence, “The patient has reported that consent was withdrawn to the procedure and that the procedure continued despite such withdrawal of consent, with the subsequent infarction documented above” to mean only that Mrs. Windsor told Dr. Jones the infarction occurred subsequent to her withdrawal of consent is incompatible with the next sentence of Dr. Jones’s report.  Such a construction of this sentence, in light of the report as a whole, is a misapplication of the law, arbitrary, and legally unreasonable in the factual-legal context in which it is made.  To the extent the trial court utilized this possible alternative construction of a single sentence in Dr. Jones’s two and one-half 
page report to negate the report’s overall expression of Dr. Jones’s causation opinion that Mrs. Windsor’s prolonged ischemia was due to Dr. Maxwell’s refusal to stop the procedure and resulted in a subsequent infarction corresponding to the vertebral artery puncture wound injury, the trial court abused its discretion.

Moreover, viewing this sentence in Dr. Jones’s report in conjunction with the sentence that follows it, is not “reviewing the evidence in the light most favorable to the non-prevailing party” as the majority contends.  The trial court’s focus in making a section 13.01(
l
) adequacy determination is supposed to be upon whether the expert report constitutes a good faith effort at compliance with section 13.01(r)(6) by informing the defendant of the specific conduct called into question and providing a basis for the trial court to conclude that the claims have merit.  
See
 
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, §13.01(
l
), (r)(6); 
Bowie Mem’l Hosp.
, 79 S.W.3d at 53; 
Palacios
, 46 S.W.3d at 878.  Dr. Jones’s report accomplishes these purposes.  The trial court does not have the discretion, as the majority apparently believes, to generate ambiguities in expert reports by viewing single sentences in isolation and giving them alternative meanings incompatible with the report as a whole.  
Accord, e.g., Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.
, 940 S.W.2d 587, 589 (Tex. 1996) (recognizing that no ambiguity exists when one of two possible interpretations of sentence is not reasonable in light of construction of document as a whole).  The fact that one sentence in Dr. Jones’s report, when considered in isolation, may be construed as having two meanings does not render his report not a good faith effort at compliance with section 13.01(r)(6).

Lastly, the majority attempts to analogize Dr. Jones’s report to the Wrights’ expert report in 
Bowie Memorial Hospital v. Wright
.  79 S.W.3d at 52-53.  Dr. Jones’s report is vastly different from the Wrights’ expert report opining that “if the x-rays [of Mrs. Wright’s foot] would have been correctly read and the appropriate medical personnel acted upon those findings then [Mrs. Wright] 
would have had the possibility of a better outcome
.”  
Id. 
[Emphasis added.]  The Wrights’ expert opined only that 
if
 the x-rays had been correctly read and 
if
 medical personnel acted on those x-rays, 
then
 possibly Wright could have had a better outcome.  
Id.
  Here, Dr. Jones’s opinion is not an if-this-and-if-that-then-a-possibility-of-a-better-outcome-exists opinion.  Dr. Jones’s opinion is that Dr. Maxwell’s negligence in refusing to halt the procedure caused a “subsequent infarction,” “corresponding to the left vertebral artery injury,” i.e., a this-negligence-caused-that-injury opinion.

IV.  Conclusion

For all of the above reasons, I dissent.  Under the statutory language and controlling case law, Dr. Jones’s report constitutes a good faith effort at compliance with the statutory definition of an expert report.  
See
 
Tex. Rev. Civ. Stat. Ann. 
art. 4590i, § 13.01(
l
).  Consequently, the trial court abused its discretion by dismissing the Windsors’ health care liability claim.  I would sustain the Windsors’ first issue and reverse the trial court’s dismissal order.

SUE WALKER

JUSTICE

DELIVERED: August 27, 2003

FOOTNOTES
1:
The dissent is incorrect in its heavy reliance on certain words it culls from one sentence of Dr. Jones’ report, which the dissent then stretches to arrive at a meaning that the trial court, acting within its discretion, was clearly not required to join.  The dissent would require the sentence “[t]he fact that the patient withdrew consent and the procedure continued with subsequent complications, 
is indicative that the actions by Dr. Maxwell did indeed fall below the standard of care
[,]” to be interpreted not only as a statement going to the standard of care, but also as a statement that explained the causal connection between alleged mid-procedure withdrawal of consent and the injury suffered by Ms. Windsor.  We believe the trial court would have acted within its discretion in concluding that Dr. Jones was describing, in this sentence, the breach of the standard of care requirement, not explaining the issue of causation.  The dissent’s analysis of this sentence improperly attempts to review the evidence in the light most favorable to the non-prevailing party, rather than accord the trial court the benefit of its discretion.  
See Palacios
, 46 S.W.3d at 877 (directing reviewing courts not to indulge in reasonable inferences or resolve doubts in the nonmovant’s favor, but instead provide deference to the trial court’s decision).

2:
At one point the dissent declares that Dr. Jones’ opinion was that Dr. Maxwell’s negligence in refusing to halt the procedure 
“caused” 
a subsequent infarction; at another, the dissent declares that Dr. Jones’ report summarized that “
because
” Dr. Maxwell refused to stop the procedure, there was inadequate blood flow through the cerebellum.  No such language (nor any similar language) is contained in the report.  Only through the use of inferences contrary to the trial court’s ruling can the dissent’s position be maintained. 

3:
It is also noteworthy that the trial court provided the Windsors the opportunity to provide an amended report to cure the missing explanation of causation, but that the Windsors filed an amended report that did not do so. After Dr. Maxwell moved for dismissal on several grounds, including the ground that Dr. Jones’ expert report did not adequately explain how Dr. Maxwell’s conduct caused the injury, the trial court gave the Windsors an additional 30 days “to provide a sufficient written report.”  Upon the expiration of the 30-day period, with the record still absent an explanation by an expert of how Dr. Maxwell’s conduct caused the injury, the trial court dismissed the suit.

4:
The infarction (tissue death due to inadequate blood supply) the Windsors alleged to have occurred was brain tissue damage they pleaded was caused by the catheter penetrating the brain.  In support of that claim, the Windsors’ appellate attorney stated during oral argument that the infarction injury noted by Dr. Jones in his review of the MRI “was the result of the catheter . . . being pushed through the artery . . . into the white matter of her brain.”  The attorney further noted that Dr. Jones describes “a left anterior/inferior parietal infarct which is the path that the catheter went through into the white brain matter.”  The dissent implicitly disagrees with the Windsors’ analysis and concludes, without any support in the pleadings, that Dr. Jones was actually describing an injury that occurred when the catheter remained too long in the artery and blocked the necessary blood flow, causing tissue death in the area served by the artery above the blockage.

5:
A copy of Dr. Jones’s report, in its entirety, is attached.

6:
The next step in the majority’s facts-pleaded-must-match-report’s-opinions analysis will be the reversal of a trial court’s dismissal order in part when a specific factual pleading is supported by a specific correlating opinion in an expert report, and an affirmance of a trial court’s dismissal order in part as to those specific factual allegations lacking a correlating specific opinion in an expert report.  Thus, application of the analytical framework used by the majority will lead to complicated and statutorily unintended results.  

7:
The record from the motion to dismiss hearing indicates that Mrs. Windsor herself is a nurse, that she was awake during the procedure, and that because she had not yet been deposed at the time the expert report was due, she executed an affidavit setting forth the events that occurred during the procedure and provided that affidavit to Dr. Jones for him to rely upon in making his report.

8:
Ischemia is “a low oxygen state usually due to obstruction of the arterial blood supply or inadequate blood flow leading to hypoxia in the tissue.”  On-Line Medical Dictionary, Dept. of Medical Oncology, University of Newcastle upon Tyne (2003), 
at
 http://cancerweb.ncl.ac.uk./cgi-bin/omd?ischemia.

9:
An infarct is “an area of tissue death due to local lack of oxygen.”
  Id.
 
at
 http://cancerweb.ncl.ac.uk./cgi-bin/omd?infarct.

10:
The majority fails to recognize that the puncture of the vertebral artery resulted in reduced blood flow through the artery.  Dr. Jones’s report even mentions that “[r]educed flow was subsequently noted in the left vertebral artery.”

11:
In light of the factual causation information provided in Dr. Jones’s report, I cannot agree with the majority that it is conclusory.  
Cf. Earle v. Ratliff
, 998 S.W.2d 882, 890 (Tex. 1999) (holding defendant doctor’s summary judgment affidavit stating, “use of Steffe pedicle screws and plates met the standard of care” was conclusory because it “states only the conclusion that Earle met the applicable standard of care”).  As outlined above, Dr. Jones’s non-summary judgment expert report provides facts explaining the basis for his causation opinion.  

12:
Recall that Dr. Maxwell did not challenge the adequacy of Dr. Jones’s report on any other ground.

13:
Dr. Jones’s report recognizes that reduced blood flow through Mrs. Windsor’s left vertebral artery was documented by the subsequent left subclavian arteriogram.

COMMENTS AND ANNOTATIONS
Comment 1:
majority by justice richards; dissent by justice walker