COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
LELA CLARK,                                                   )                  No. 08-04-00291-CV
)
                                    Appellant,                        )                             Appeal from
)
v.                                                                          )                  120th District Court
)
HCA, INC. d/b/a DEL SOL                   )                  of El Paso County, Texas
REHABILITATION HOSPITAL,                      )
EL PASO HEALTH CARE SYSTEMS, LTD.   )                  (TC# 2003-3787)
d/b/a/ DEL SOL REHABILITATION                )
HOSPITAL, DEL SOL REHABILITATION     )
HOSPITAL, ROBERT MORENO, M.D., and    )
MARIANO PALACIOS, M.D.,                          )
)
                                    Appellees.                        )

O P I N I O N

            Lela Clark appeals the dismissal of her medical malpractice suit against Dr. Robert Moreno,
Dr. Mariano Palacios, and Del Sol Rehabilitation Hospital (Del Sol). At issue are the qualifications
of the expert witness and the adequacy of his report. Finding no abuse of discretion, we affirm. 
FACTUAL SUMMARY
            The following discussion is taken from the narrative contained within the expert report at
issue. On or about May 7, 2003, Clark was evaluated at Del Sol Medical Center Emergency
Department for chest pain, cardiac problems, nausea, and stomach pain. She was subsequently
admitted to the Inpatient Rehabilitative Program at Del Sol Rehabilitation Hospital. “Physicians
verbal orders” prescribed the twice daily 66 mg subcutaneous administration of Lovenox, an
anticoagulant often used for deep venous thrombosis (DVT) prophylaxis in patients at risk. Lovenox
is contraindicated for elderly patients with hypertension and renal insufficiency. Clark was 79 years
old, suffered from hypertension, and was post-nephrectomy as a result of renal cancer. 
            On May 13, Clark had bruising in her abdominal area and large palpable lumps allegedly
caused by the Lovenox. On May 17, she complained about pain in her right arm, and a bump was
discovered in front of her right elbow. A vascular Doppler ultrasound of the right arm was negative
for DVT, but a large amount of fluid was found in the right antecubital fossa. 
            On May 19, Clark was transferred to the acute care facility at Del Sol Medical Center under
the supervision of Dr. Enrique Porras. The discharge summary from the rehabilitation facility
indicated that the “patient developed compartment syndrome . . . .” Dr. Porras noted that Clark had
a significant amount of pain and decreased range of motion. He diagnosed a hematoma of the right
arm and hypertensive crisis due to pain and anxiety. His recommendation was to administer Vitamin
K on a daily basis for three days, to continue the Lovenox, and to apply heat packs to the swelling. 
On May 20, a CT scan was consistent with the clinical suspicion of a hematoma. 
            On May 21, Dr. Maria Angelina Halsted evaluated Clark and suspected an infected
hematoma. She noted that Clark was unable to extend her right arm, but there was no motor deficit
in the right hand. Dr. Halstead recommended incision and drainage with decompression to ensure
that Clark had not developed compartment syndrome. This procedure was performed the next day
and revealed a large hematoma but “no evidence of compartment syndrome . . . with complete
function of the hand and muscle on inspection.” Clark was discharged on May 29, 2003. There was
no mention of her range of motion upon discharge. 
THE PLEADINGS
            On August 29, 2003, Clark sued HCA, El Paso Healthcare Systems, Del Sol Rehabilitation
Hospital, Dr. Moreno, and Dr. Palacios on a medical malpractice claim. The basis of the suit against
all defendants was pled in the following particulars:
HCA and El Paso Healthcare Systems own and operate Del Sol. The nurses and staff
at Del Sol had a duty [to] monitor the status of Plaintiff for indications of an adverse
reaction to the medications being administered by them. They had a further duty to
administer all medications properly as instructed by the treating physicians. 
Dr. Moreno and Dr. Palacios had a duty to properly assess Plaintiff, to properly
review the medical history of Plaintiff and properly prescribe medications that are not
contraindicated for a patient with Plaintiff’s history. As a result of the failures of the
nursing staff of Del Sol, and most particularly, because of the failure of Dr. Moreno
and Dr. Palacios to properly assess Plaintiff’s medical history and properly prescribe
medications, Plaintiff was forced to endure a painful condition which required
subsequent painful surgery and is left with an 80%-90% paralysis of her right hand. 
Plaintiff has lost all independence and has been forced to remain in a long term care
facility in order to receive appropriate care. 

Clark timely filed an expert report and curriculum vitae from Dr. Elmer Pacheco. Dr. Pacheco
reviewed the medical care provided to Clark at Del Sol Medical Center and Del Sol Rehabilitation
Hospital in rendering his opinion. 
            On May 24, 2004, Dr. Palacios filed a motion challenging the adequacy of the expert report
and seeking dismissal of the claim. He argued that the report did not demonstrate that Dr. Pacheco
was qualified to render an expert opinion. He also alleged that the report did not (1) support the
plaintiff’s allegations, (2) set out the standard of care applicable to him or how he breached it, or (3)
explain how the breach caused Clark’s injury. On May 25, Dr. Moreno also filed a motion
challenging the adequacy of the expert report and seeking dismissal on the same grounds. Del Sol
filed its motion on July 19.
            Clark filed a response supported by her attorney’s affidavit. Counsel explained that he
believed Dr. Pacheco was qualified to render an opinion because he was a board certified internist. 
In his view, Pacheco properly discussed the standards of care, the standards breached, the results of
the breach, and damages. Counsel thus believed that the report met the requirements of the Act but
opined that if it did not, then it was the result of accident or mistake. He then sought a thirty-day
grace period in which to file an amended report. The trial court granted the motions challenging the
report and dismissed the suit with prejudice. 
THE MEDICAL LIABILITY AND INSURANCE IMPROVEMENT ACT
            The Medical Liability and Insurance Improvement Act (“the Act”) was enacted by the Texas
Legislature to curtail frivolous claims. Hart v. Wright, 16 S.W.3d 872, 876 (Tex.App.--Fort Worth
2000, pet. denied); Horsley-Layman v. Angeles, 968 S.W.2d 533, 537 (Tex.App.--Texarkana 1998,
no pet.). In order to encourage the screening of medical malpractice claims by an expert prior to
filing, the Act requires a plaintiff to provide each defending physician or health care provider with
one or more expert reports relating to liability and causation. Wood v. Tice, 988 S.W.2d 829, 830
(Tex.App.--San Antonio 1999, pet. denied); see Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1,
sec. 13.01(d), 1995 Tex.Gen.Laws 985, 987 (repealed 2003).


 The expert report, along with a
curriculum vitae of each expert, must be furnished to the defendant not later than the 180th day after
the date on which a health care liability claim is filed or the last day of any extended period as
permitted under the statute. Id. Where an expert report is tendered, the defendant may challenge the
adequacy of the report via a motion to dismiss. Id. § 13.01(l); Hart, 16 S.W.3d at 876. A report
authored by a person who is not qualified to testify cannot constitute an adequate report. In re
Samonte, 163 S.W.3d 229 (Tex.App.--El Paso 2005, orig. proceeding). A challenge to the adequacy
of a report may be based on a claim that it fails to demonstrate the person rendering the opinion is
qualified to testify, as well as on other claims of its inadequacy. Id.
            The trial court must grant the motion only if it appears to the court, after hearing, that the
report does not represent a good faith effort to comply with the definition of an expert report. See
Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(l), 1995 Tex.Gen.Laws 985, 987
(repealed 2003); American Transitional Care Centers of Texas, Inc. v. Palacios, 46 S.W.3d 873, 878
(Tex. 2001). An expert report is defined as a fair summary of the expert’s opinions regarding: (1)
applicable standards of care, (2) the manner in which the care rendered by the physician or health
care provider failed to meet the standards, and (3) the causal relationship between that failure and
the injury, harm, or damages claimed. Id. § 13.01(r)(6). In determining whether the report
represents a good faith effort, the trial court’s inquiry is limited to the four corners of the report. See
Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(r)(6), 1995 Tex.Gen.Laws 985, 987
(repealed 2003); Palacios, 46 S.W.3d at 878. To constitute a “good faith effort,” the report must:
(1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must
provide a basis for the trial court to conclude that the claims have merit. Palacios, 46 S.W.3d at 879. 
To inform the defendant of the specific conduct the plaintiff has called into question, the report must
support the cause of action alleged by the plaintiff in her pleadings. Windsor v. Maxwell, 121
S.W.3d 42, 50 (Tex.App.--Fort Worth 2003, pet. denied).
            The report need not marshal all of the plaintiff’s proof, but it must include the expert’s
opinion on each of the three elements identified by the Act: standard of care, breach, and causal
relationship. A report cannot merely state the expert’s conclusions about these elements. Rather,
the expert must explain the basis of his statements to link his conclusions to the facts. Id. Likewise,
a report that omits any of the statutory requirements does not constitute a good faith effort. Palacios,
46 S.W.3d at 879.
STANDARD OF REVIEW
            We review a trial court’s dismissal under former Article 4590i, section 13.01(r)(6) under an
abuse of discretion standard. American Transitional Care Centers of Texas, Inc. v. Palacios, 46
S.W.3d 873, 877 (Tex. 2001). Under this standard, we determine whether the trial court acted
arbitrarily and without reference to any guiding rules or principles when it struck Clark’s expert
report and dismissed her case. Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003). We may not
reverse a trial court’s discretionary ruling simply because we might have decided it differently. Id.
EXPERT QUALIFICATIONS
            In Point of Error One, Clark contends that Dr. Pacheco was qualified to render an opinion
on the standard of care. Several courts of appeals have recognized that to comply with Section
13.01(d) and (r)(6), the expert report must establish, on its face, that the purported expert is qualified. 
See Estate of Allen v. Polly Ryon Hospital Authority, No. 01-04-00151-CV, 2005 WL 497291 at *3
(Tex.App.--Houston [1st Dist.] March 3, 2005, no pet. h.)(not reported); Hansen v. Starr, 123
S.W.3d 13, 20 (Tex.App.--Dallas 2003, pet. denied); Chisholm v. Maron, 63 S.W.3d 903, 907
(Tex.App.--Amarillo 2001, no pet.); Schorp v. Baptist Memorial Health System, 5 S.W.3d 727, 732
(Tex.App.--San Antonio 1999, no pet.).
            Former Article 4590i, section 14.01 sets out the requirements for an expert witness in a suit
against a physician. A person may qualify as an expert witness on the issue of whether the physician
departed from accepted standards of medical care only if the person is a physician who: (1) is
practicing medicine at the time such testimony is given or was practicing medicine at the time the
claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis
of training or experience to offer an expert opinion regarding those accepted standards of medical
care. See Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14 .01(a), 1995 Tex.Gen.Laws 985,
988 (repealed 2003). The report itself must establish the expert’s qualifications on the basis of
training and experience. See In re Windisch, 138 S.W.3d 507, 511 (Tex.App.--Amarillo 2004, orig.
proceeding).
            In determining if an expert is qualified on the basis of training and experience, the court is
to consider whether, at the time the claim arose or the testimony is given, the witness is board
certified or has other substantial training or experience in an area of practice relevant to the claim
and is actively practicing medicine in rendering medical care services relevant to the claim. See Act
of May 1, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(c), 1995 Tex.Gen.Laws 985, 988 (repealed
2003). Because of the increasing specialization of medicine, “there is no validity, if there ever was,
to the notion that every licensed medical doctor should be automatically qualified to testify as an
expert on every medical question. . . . [T]he proponent of the testimony has the burden to show that
the expert ‘possess[es] special knowledge as to the very matter on which he proposes to give an
opinion.’” Broders v. Heise, 924 S.W.2d 148, 152-53 (Tex. 1996). Thus, the issue is the specific
subject matter and the expert’s familiarity with it. Broders, 924 S.W.2d at 153.
            Dr. Pacheco’s curriculum vitae (CV) reveals that he is board certified in internal medicine,
oncology, and nuclear medicine. He completed an internal medicine internship and residency at 
University District Hospital, Medical Sciences Campus in Rio Pierdas, Puerto Rico from 1981 until
1984. He was on active duty with the United States Army Medical Corps from 1984 until 1988.
Between 1988 and 1990, he pursued a medical oncology fellowship at M.D. Anderson Cancer Center
in Houston. His nuclear medicine fellowship was obtained at William Beaumont Army Medical
Center in El Paso from 1992 until 1994. He remained at Fort Bliss in El Paso until 1996, serving
as teaching staff and a staff physician in nuclear medicine and hematology-oncology. He then
launched his private practice. His CV indicates he practiced as a physician in Laredo and El Paso,
Texas; Sioux Falls, South Dakota; Wausau and Sheboygan, Wisconsin; Grand Junction, Colorado,
and Thomasville, Georgia. Most recently he was employed as a “[p]hysician with Pacific Coast
Hematology/Oncology.” All of the Appellees allege that at the time of Clark’s treatment, Dr.
Pacheco was engaged in the practice of oncology. Clark has not professed otherwise.
            The expert report makes no mention of Dr. Pacheco’s training, experience, or familiarity with
Lovenox, anticoagulant medications, deep venous thrombosis, diagnosis and treatment of
compartment syndrome, or the causes and results of hematoma. Dr. Pacheco merely quotes a few
medical reference materials with no supporting information concerning the qualifications or
expertise of the authors. We are left then with his CV. Dr. Pacheco’s specialty in hematology may
well qualify him to render an opinion, but the record is silent as to his current role as a hematologist
or his experience with anticoagulation therapy. While the CV lists a one-year membership on the
Pharmacy Utilization Committee at Archbold Memorial Hospital in Thomasville, Georgia, the record
does not establish his awareness of the common usage of Lovenox, contraindications of its usage,
or whether he is familiar with the treatment required in the event of an adverse reaction. See
Broders, 924 S.W.2d at 153. Because we cannot conclude that the trial court abused its discretion
in finding that Dr. Pacheco was not qualified to testify as an expert, we overrule Point of Error One.                                                  ADEQUACY OF THE REPORT
            In Point of Error Two, Clark complains that the trial court erred in finding that the expert
report was inadequate. In their motions challenging the expert report, Appellees argued that the
report did not properly set out the standard of care, breach, or causation. 
The Report
            Dr. Pacheco reviewed the medical records from Del Sol Rehabilitation Hospital from May 7
until May 19 and the records from Del Sol Medical Center from May 19 until May 29. We have
already detailed his narrative of events in our factual summary. After narrating this sequence of
events, Dr. Pacheco turned to the standard of care. Rather than stating his personal knowledge of
the applicable standard of care, he set out nine text boxes containing excerpts from different
publications. Because of the unusual format, we quote it verbatim:
STANDARD OF CARE

A recently published Hospital Medicine Consensus Reports issued a consensus panel statement
on the ‘Prophylaxis of Venous Thromboembolism (VTE) in the Hospitalized Medical Patient.’ 
It states that all medical inpatients should be screened and considered for VTE prophylaxis. 
Subsequently, there follows a risk factor assessment based on whether the patient has restricted
mobility AND at least one VTE risk factor (such as age greater than 40, heart failure, chronic
lung disease). If these criteria are met then pharmacologic prophylaxis for VTE is indicated
provided there are no exclusion criteria for such. Possible exclusion criteria include
uncontrolled hypertension, significant renal insufficiency (creatinine clearance < 30 ml/minute),
among others. If the patient is a candidate for prophylaxis the recommended enoxaparin
(Lovenox®) dosage is 40 mg SQ once daily. 




Melde SL. Enoxaparin-induced retroperitoneal hematoma. Ann Pharmacother 2003; 37(6):
822-4


Alford et al reported on the occurrence of a ‘...a compartment syndrome caused by a hematoma
which resulted from noninvasive blood pressure monitoring during thrombolytic therapy...’

Alford JW, Palumbo MA, Barnum MJ. Compartment syndrome of the arm: a complication of
noninvasive blood pressure monitoring during thrombolytic therapy for myocardial infarction. J
Clin Monit Comput 2002. 17 (3-4):13-6




On the diagnosis of compartment syndrome of the upper extremity, Seiler et al commented that
‘...careful attention to the details of the history and physical examination can assist in the
development of a usaeful working diagnosis. Testing ITPs (Intracompartmental Pressure) is the best
method available to help confirm the diagnosis...’

Seilar JG, Casey PJ, Binford SH. Compartment syndromes of the upper extremity. J South Orthop
Association 2000 Winter. 9(4):233-47


‘...Accute compartment syndrome can have disastrous consequences... unusual pain may be the only
symptom of an impending problem...after 8 hrs, the damage (to the muscle) is irreversible
...fasciotomy generally should be done when tissue pressure rises past 20 mmHg below diastolic
pressure...’

Whitesides TE, Heckman MM. Acute compartment syndrome: Update on Diagnosis and Treatment. 
J AM Acad Orthop Surg 1996; 4(4):209-218


Kam et al “Evaluated the accuracy of commonly accessed medical textbooks in their description
of the presenting sign/symptoms of acute compartment syndrome... (and found that) ... there are
only three (symptoms) pain, paresthesia, paresis which are important...

Kam JL, Hu M, Peiler LL, Yamamoto LG. Acute compartment syndrome signs and symptoms
described in medical textbooks. Hawaii Med J 2003; 62(7):142-4



‘...High clinical suspicion is of paramount importance in evaluating the hand or wrist for an
evolving compartment syndrome. A detailed history coupled with a thorough physical examination
form the basis for the diagnosis. The use of techniques to measure compartment pressures forms
the objective foundation to assist in formulating the correct treatment plan... great fault can be
assigned to the clinician who chooses to ignore an evolving compartment syndrome that
unnecessarily places the patient at risk of permanent disability. Here, the cosmetic benefit of
avoiding the fasciotomy is overwhelmed by the often-devastating dysfunction created by ischemic
damage to the contents of the affected compartments...’


Ortiz JA, Berger RA. Compartment syndrome of the hand and wrist. Hand Clin
1998;14(3):405-18


The creatinine clearance (on 5/8/03) in this case can be calculated in several ways (patient age 79,
serum creatinine 1.5 mg/dL, weight 55.3 kg, height 172 cm, and BSA 1.65m[2]:

1. Using the Cockcroft and Gault equation (Nephron 1976;16(1):31-41): 26.4 ml/min

2. Sanaka

CAUSAL RELATIONSHIP BETWEEN FAILURE TO MEET
STANDARD OF CARE AND INJURY, HARM, OR DAMAGES
CLAIMED
As of the date of this report, and my review of the above described records, it is my
opinion that Del Sol Rehabilitation Hospital, Robert Moreno, M.D. and Mariano
Palacios, M.D. failed to meet the above described standards of care by failing to
properly assess, monitor and timely treat the complications which developed as a
result of the improper use of Lovenox. By failing to meet the standard of care, based
on a reasonable medical probability, the development of the acute, compartment
syndrome created the ‘devastating dysfunction created by ischemic damage’ causing
the complete loss of use of Lela Clark’s right arm. 
Standard of Care
            “Identifying the standard of care is critical: Whether a defendant breached his or her duty
to a patient cannot be determined absent specific information about what the defendant should have
done differently.” Palacios, 46 S.W.3d at 880. Dr. Pacheco’s report quoted several sources that all
inpatients should be screened and considered for venous thromboembolism prophylaxis based on
a risk factor assessment. If pharmacologic prophylaxis is indicated, Lovenox (enoxaparin) should
be given unless other exclusion criteria apply. He then referenced five articles in which
compartment syndrome was discussed. At no point did he indicate that he was personally familiar
with the standard of care or that the authors of the various articles had sufficient expertise. 
Breach of the Standard of Care
            Dr. Pacheco opined that the standard of care was breached by Dr. Moreno, Dr. Palacios, and
Del Sol since they failed to properly assess, monitor, and timely treat the complications which
developed as a result of the improper use of Lovenox. A physician verbally ordered administration
of 66 mg of Lovenox twice daily, and Clark’s home medications for hypertension were also
continued. Dr. Pacheco did not specify which physician ordered the administration of the Lovenox. 
He did note that Dr. Porras continued the Lovenox even after Clark was transferred from Appellees’
care. Clark arguably met the exclusion criteria for use of Lovenox since she was 79 and suffered
from congestive heart failure, hypertension, and renal disease. But Dr. Pacheco did not state that the
defendants failed to properly recognize the risk factors for venous thromboembolism or the exclusion
criteria for use of Lovenox. He did not address whether Lovenox was administered due to an
indication of pharmacologic prophylaxis for venous thromboembolism. He didn’t even say that
Lovenox was contraindicated; he merely asserted that Clark met the exclusion criteria. There was
no discussion of risk vs. benefit. Instead, Dr. Pacheco focused on the symptoms of compartment
syndrome although the medical records were unclear as to whether Clark actually suffered from
compartment syndrome. And he concluded, without detailing the factual basis for his conclusion,
that Clark indeed had compartment syndrome. Finally, Dr. Pacheco failed to state what each of the
defendants should have done differently. 
Causation
            The report also fails to adequately address causation, primarily because of a large analytical
gap. Stated simply, Dr. Pacheco opined that Appellees failed to treat the complications resulting
from the improper use of Lovenox. He then jumped to the conclusion that “the acute, compartment
syndrome created the ‘devasting dysfunction created by ischemic damage’ causing the complete loss
of use of Lela Clark’s right arm.” The missing link is not that compartment syndrome caused
devastating dysfunction. The missing link is that the improper use of Lovenox caused compartment
syndrome. We conclude that Dr. Pacheco’s expert report was inadequate. Point of Error Two is
overruled. 
GOOD FAITH EFFORT
            In Point of Error Three, Clark complains that the trial court erred in finding that the report
was not a good faith effort to comply with the requirements of Article 4590i. To constitute a
good-faith effort, an expert report must discuss the standard of care, breach, and causation with
sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit. Palacios, 46 S.W.3d at
875. To inform the defendant of the specific conduct the plaintiff has called into question, the report
must support the cause of action alleged in the plaintiff’s petition. Windsor, 121 S.W.3d at 50. 
When the expert report’s conclusory statements do not put the defendant or the trial court on notice
of the conduct complained of, the trial court no discretion but to find that the report does not
represent a good faith effort. Palacios, 46 S.W.3d at 880. Since the report did not discuss the
standard of care and breach with sufficient specificity, it cannot constitute a good faith effort. See
Palacios, 46 S.W.3d at 875. Moreover, the report does not support the cause of action Clark alleged
in her pleadings. She alleged that Appellees breached the standard of care by failing “to properly
assess Plaintiff’s medical history and properly prescribe medications.” In other words, the standard
of care was breached by the administration of Lovenox. Dr. Pacheco, on the other hand, opined that
the standard of care was breached by “failing to properly assess, monitor and timely treat the
complications . . . of Lovenox.”
            Since the report did not represent a good faith effort to comply with the statutory
requirements, the trial court had no discretion but to dismiss Clark’s claim with prejudice. See
Palacios, 46 S.W.3d at 880. We overrule Point of Error Three and affirm the judgment of the trial
court.

August 25, 2005                                                          
                                                                                    DAVID WELLINGTON CHEW, Justice

Before Barajas, C.J., McClure, and Chew, JJ.
(McClure, J., not participating)