NUMBER 13-09-00706-CV





COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


FERNANDO OTERO, M.D., MCALLEN 

HOSPITALS, L.P. D/B/A EDINBURG 

REGIONAL MEDICAL CENTER, 

AND RAMIRO LEAL, M.D., Appellants,


v.
 


FARIDE LEON A/K/A FARIDE CARMONA 

AS NEXT FRIEND OF DANIELA CARMONA, 

A MINOR CHILD, Appellee.

 


On appeal from 332nd District Court 


of Hidalgo County, Texas.


 


OPINION



Before Justices Rodriguez, Benavides, and Vela


Opinion by Justice Rodriguez




 Appellants Fernando Otero, M.D., McAllen Hospitals, L.P. d/b/a Edinburg Regional
Medical Center (McAllen Hospitals), and Ramiro Leal, M.D. challenge the trial court's
denial of their motions to dismiss appellee Faride Leon's (1) health care liability claim filed on
behalf of her daughter for failure file an adequate expert report as required by section
74.351. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)-(b) (Vernon Supp. 2009). 
Each appellant filed a brief. By two issues, Dr. Otero argues that the trial court erred in
failing to (1) dismiss Leon's claims because her expert report did not identify the applicable
standard of care or explain the causal connection between the alleged breach and Leon's
injury, and (2) award him attorneys' fees. By one issue, McAllen Hospitals argues that the
trial court erred in denying its motion to dismiss because Leon's expert report did not
identify the applicable standard of care, state the manner in which the standard was
breached, or explain causation. By two issues, Dr. Leal (1) complains that Leon failed to
timely serve her expert report on him, and (2) challenges the causation element of Leon's
expert report. We affirm.

I. Background

 This case involves alleged injuries incurred by Leon's daughter, Daniela Carmona,
during her delivery at McAllen Hospitals's Edinburg Regional Medical Center (Edinburg
Regional). Dr. Leal was Leon's obstetrician during her prenatal period; Dr. Otero
performed the delivery of Daniela. Leon filed suit on behalf of Daniela in connection with
the treatment appellants rendered during this period.

 In her petition, Leon alleges that she first went to Edinburg Regional on June 26,
2004, complaining of right pelvic pain. An ultrasound was performed, and it was
determined that she had a cyst on her right ovary. Leon was given medicine for her pain
and sent home. Two days later, Leon returned to Edinburg Regional, complaining of right
lower abdominal pain, contractions, and back pain. Dr. Leal ordered another ultrasound,
which revealed another cyst. Leon alleges that no evaluation of the fetus was performed
during either ultrasound. Labor was then induced, and at some point before Daniela's
delivery, Leon's care was transferred to Dr. Otero. Dr. Otero used a vacuum extractor to
deliver Daniela. Leon alleges that Daniela had a large cephalhematoma, bruising, and was
macrosomic. (2) Leon also alleges that Daniela suffered a fractured left clavicle and left Erb's
palsy. (3)

 Leon claims that the negligence and/or gross negligence of Dr. Otero, Dr. Leal, and
McAllen Hospitals caused the fractured clavicle and Erb's palsy Daniela suffered during
and after her delivery. As a result of these injuries, Leon claims that Daniela underwent
a subsequent surgery and multiple physical therapy sessions to attempt improvement of
Daniela's left arm and hand function. Leon claims actual (non-economic and economic)
damages for Daniela's past and future physical and mental pain and suffering,
disfigurement, physical impairment, inconvenience, past and future medical expenses, and
loss of future earning capacity. She also claims exemplary damages.

 It is undisputed that Leon timely served the expert reports of Ezell S. Autrey, M.D.
and John R. Seals, M.D. on each appellant, and each appellant filed objections to the
reports, contesting their adequacy under section 74.351, and motions to dismiss Leon's
claims. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)-(b). Leon responded to Dr.
Otero's objections and motion to dismiss, and the record reflects that, after a hearing, the
trial court entered an order, which noted that it heard Dr. Otero's objections and motions,
found that Leon's expert reports were good faith efforts to comply with section 74.351, and
granted Leon a thirty-day extension to file amended reports. (4) See id. § 74.351(c). 

 Thereafter, Leon served on each appellant the amended expert report of Dr. Autrey
along with a copy of Dr. Seals's original report. Dr. Otero filed objections to the amended
report and a second motion to dismiss Leon's claims. Neither Dr. Leal nor McAllen
Hospitals filed objections to the amended report or second motions to dismiss. The trial
court held a hearing and entered an order denying the appellants' motions to dismiss. This
interlocutory appeal followed. See id. § 51.014(a)(9) (Vernon 2008) (authorizing an
interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)). 

II. Standard of Review and Applicable Law

 We review a trial court's decision on a motion to dismiss under section 74.351 of the
civil practice and remedies code for abuse of discretion. Jernigan v. Langley, 195 S.W.3d
91, 93 (Tex. 2006); Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873,
878 (Tex. 2001); see Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). The trial court
abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding
rules or principles. Walker v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003).

 Under section 74.351 of the Texas Civil Practice and Remedies Code, a claimant
must "serve on each party or the party's attorney" an expert report and curriculum vitae
"not later than the 120th day after the date the original petition was filed." Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(a). An expert report is "a written report by an expert that
provides a fair summary of the expert's opinions . . . regarding applicable standards of
care, the manner in which the care rendered . . . failed to meet the standards, and the
causal relationship between that failure and the injury, harm, or damages claimed." Id. §
74.351(r)(6). 

 A "fair summary" of the applicable standard of care and breach identifies the type
of care expected but not rendered. Palacios, 46 S.W.3d at 880. The causation
requirement is met if the report explains the basis of the expert's statement, linking his
conclusions to the facts. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A
conclusory report does not meet the statutory test because it does not satisfy Palacios. 
Id. at 53.

 In our review of the expert report, we are limited to the four corners of the report in
determining whether the report manifests a good faith effort to comply with the statutory
definition of an expert report. Palacios, 46 S.W.3d at 878; see Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(l) (requiring that the trial court "grant a motion challenging the
adequacy of the expert report only if appears to the court, after hearing, that the report
does not represent an objective good faith effort to comply" with the statutory definition). 
The report "need not marshal all the plaintiff's proof." Palacios, 46 S.W.3d at 878;
Jernigan, 195 S.W.3d at 93. If the expert report puts the defendant on notice of the
specific conduct complained of and provides the trial court a basis on which to conclude
the claims have merit, the report represents a good-faith effort to comply with the statute. 
Palacios, 46 S.W.3d at 879.

III. Discussion

 Appellants separately challenged the trial court's denial of their motions to dismiss,
and we will thus address each of their issues in turn.

A. Dr. Otero

 By his first issue, Dr. Otero argues that the trial court erred in denying his motion to
dismiss because Leon's amended expert reports do not adequately articulate the standard
of care or explain the causal link between any alleged negligence by Dr. Otero and the
injuries suffered by Daniela.

1. The Reports

 Dr. Autrey's report stated that, at the time of Daniela's delivery, Leon was twenty-four years old, five feet five inches tall, and weighed over 355 pounds. Leon gained over
thirty-three pounds during her pregnancy and, in the days immediately preceding Daniela's
delivery, had elevated glucose levels. Leon was administered an epidural, and her labor
was induced. Dr. Otero delivered Daniela with a vacuum extractor; she weighed eight
pounds eleven ounces.

 Dr. Autrey's report then included, in relevant part, the following discussion:

 The standard of care for a reasonably prudent obstetrician is to know
the risk factors for shoulder dystocia, and to independently evaluate the
patient for these risk factors. Once Dr. Leal transferred Faride Carmona
[Leon] and her baby to Dr. Otero he became responsible for their welfare. 
The standard of care requires that Dr. Otero perform an independent
assessment of the patient. A reasonable obstetrician would have known and
identified the risk factors above.


 A reasonably prudent obstetrician when faced with a patient at
significant risk for shoulder dystocia should not use a vacuum extractor or
other tool to deliver the baby. . . .


 The risk factors[] for shoulder dystocia . . . include primigravida,[ (5)]
short maternal stature, obesity, increased weight gain during the pregnancy,
and induction of labor with epidural anesthesia. Dr. Otero breached the
standard of care when he used a vacuum extractor to deliver Daniela
Carmona.


 There was no indication in the medical record for the use of the
vacuum. According to the record the child was a large baby (macrocosmic)
[sic], at the described stage of labor the patient had only been pushing for 14
minutes with no evidence of fetal distress. It is not uncommon for a first time
mother to push for 2-3 hours. There was no reason to apply the vacuum. 
The use of tools such as the vacuum extractor is a decision made by the
physician and its use in connection with shoulder dystocia is considered a
substantial factor for brachial plexus injury and Erb's palsy.


 The appearance of any of the risk factors mentioned above requires
the obstetrician to have a plan to deal with a shoulder dystocia should it
arise. The reasonably prudent obstetrician uses a selective approach,
reserving epsisiotomy to facilitate maneuvers such as delivery of the
posterior arm or internal rotation of the shoulders. The McRobert's
maneuver is the single most effective intervention and should be performed
first, followed by suprapubic pressure. Suprapubic pressure can be
employed together with the McRobert's maneuver. Preparations should
always be made for a Caesarean delivery with the necessary personnel and
equipment to accomplish same.


 The standard of care requires that a second nurse be in the room in
position to do the McRobert's maneuver and apply suprapubic pressure as
necessary. Dr. Otero departed from the standard of care by failing to
recognize that Faride Carmona [Leon] demonstrated multiple risk factors for
shoulder dystocia. He recklessly decided to proceed with an improper
vacuum assisted vaginal delivery, rather than wait and apply the McRobert's
maneuver or perform a Caesarean delivery. Either of which would have
avoided the shoulder fracture and brachial plexus nerve injury Daniela
sustained at birth. . . . 


 When dictating a report an obstetrician is required to give an accurate
account of the delivery and the status of the baby. Dr. Otero's delivery note
states that there were no lacerations when in fact the nurse's notes clearly
indicate that he repaired a midline laceration. Dr. Otero's dictated delivery
note states the delivery was a "spontaneous vaginal delivery". Dr. Otero
used a vacuum to affect the delivery. Therefore, this was a vacuum assisted
vaginal delivery. By definition a vacuum assisted delivery is not
spontaneous.


 Dr. Otero's notes fail to indicate that Daniela Carmona had a large
cephalohematoma, fractured left clavicle, bruising and a brachial plexus
injury. None of these things were noted by Dr. Otero in his dictated delivery
note. All of these findings are consistent with a traumatic vacuum assisted
vaginal delivery with shoulder dystocia. Not a straight forward delivery as Dr.
Otero indicates in his dictated operative note.


 The departures from the standard of care by Fernando Otero, M.D.
were the direct and foreseeable (proximate) cause of the injuries to Daniela
Carmona. Daniela Carmona's brachial plexus injury, the left clavicle fracture,
left Erb's palsy with subsequent surgery and the multiple physical therapy
sessions required to attempt to improve her left arm and left hand function
were avoidable and are a direct and foreseeable result of the inappropriate
(negligent) use of the vacuum extractor.


 In his report, Dr. Seals stated that he reviewed the birth, neonatal, and other medical
records regarding Daniela's Erb's palsy treatment. He then opined as follows:

 These records document the occurrence in Daniela of a fractured
clavicle and left Brachial Plexus Palsy (aka "Erb's" Palsy) in the newborn
period. She appeared to have had some early partial improvement in
movements of her left upper extremity, but continued to demonstrate
significant motor impairment with muscle weakness and/or dysfunction of
muscle groups from the shoulder to her forearm, wrist and fingers. 
Evaluation at the Scottish Rite Hospital in Dallas resulted in decisions to
surgically intervene in hopes of improving overall function in her left arm. 
While these procedures improved some of the range of motion in that
extremity, she has been left with significant compromise in motor functions,
especially related to her shoulder girdle muscles.


 The likely consequence of this type of injury, within reasonable
medical probability, will significantly alter Daniela's growth and development
throughout childhood and into adulthood. The areas of primary concern are
both physical and psychological in nature. She will have to adapt to using
predominantly her right upper extremity to carry out tasks that most children
use both upper extremities to carry out. She will learn to use her left hand
and arm only in a supportive and assisting fashion most of the time. Her
shoulder instability will limit many activities requiring shoulder girdle muscle
strength. This will obviously result in limitations regarding various sports
activities as well as employment opportunities in the future. This type of
disability is likely to have a significant psychological impact as she matures
through her teens and into adulthood.


 Erb's Palsy is a condition which is the result of a traumatic stretch
injury to the brachial plexus during the birth process. It is well accepted that
the mechanics of the injury include lateral flexion of the head while the
shoulder is being held fixed against the mother's pelvic rim during the birthing
process. Logically this is the only sequence of events that can adequately
explain the forces necessary to result in the avulsion of nerve roots in the
cervical spine region during birth.


2. Standard of Care


 Dr. Otero contends that the articulated standard was insufficient because it referred
to risk factors Leon did not have. In support of this contention, Dr. Otero points to the
following risk factors enumerated in the section of Dr. Autrey's expert report devoted to Dr.
Leal:

 Risk Factors for Shoulder Dystocia:


  Suspected large baby - over 8 lbs 14 oz.

  maternal diabetes/gestational diabetes (fetal asymmetry)

  Maternal obesity

  An overdue baby - over 40 weeks

  Short maternal stature

  Contracted or flat (platypelloid) pelvis

  Maternal weight gain - more than 35 lbs.

  Protracted first stage of labor

  Prolonged second stage of labor


Dr. Otero contends that "the risk factors identified . . . [by Dr. Autrey] do not correlate to Dr.
Autrey's recitation of Ms. Carmona's presentation" because Leon gained more than thirty-three pounds (instead of more than thirty-five) and Daniela weighed eight pounds eleven
ounces at birth (instead of over eight pounds fourteen ounces). Dr. Otero also contends
that Leon was not overdue and did not have histories of prolonged first or second stages
of labor. Dr. Otero claims that Dr. Autrey's report listed only one of the foregoing risk
factors for Leon--obesity.

 We cannot conclude that the minute difference between Leon's weight gain and
Daniela's birth weight and those listed in the above risk factors merits the attention paid by
Dr. Otero in his brief. Rather, we think it clear that Leon exhibited the risk factors stated
by Dr. Autrey elsewhere in his report--"primigravida, short maternal stature, obesity,
increased weight gain during the pregnancy, and induction of labor with epidural
anesthesia"--and will not invalidate Dr. Autrey's carefully stated standard of care based
on the proverbial splitting of hairs urged by Dr. Otero on appeal. Dr. Autrey articulated the
type of care expected from Dr. Otero but not rendered, and we thus conclude that Leon's
expert reports sufficiently set forth the standard of care as required by section 74.351. See
Palacios, 46 S.W.3d at 880. 

3. Causation

 Dr. Otero also contends by his first issue that Leon's expert reports are deficient as
to causation because the statements in the reports regarding causation are conclusory and
do not link any breach by Dr. Otero to the injuries claimed by Leon in her suit. Dr. Otero
contends that Leon's reports fail to explain how the use of a vacuum extractor--the breach
identified by Dr. Autrey in his report--caused the fractured left clavicle and brachial plexus
injury (i.e., Erb's palsy) suffered by Daniela. We disagree.

 When read together, the reports of Dr. Autrey and Dr. Seals contain an adequate
factual basis linking Dr. Otero's breach to Daniela's injuries. See Tex. Civ. Prac. & Rem.
Code Ann. § 75.351(i) (allowing multiple experts to address the issue of causation); Bowie
Mem'l Hosp., 79 S.W.3d at 52. Dr. Autrey opines that the "use of tools such as the
vacuum extractor is a decision made by the physician and its use in connection with
shoulder dystocia is considered a substantial factor for brachial plexus injury and Erb's
palsy" and that Daniela's fractured clavicle, bruising, and brachial plexus injury "are
consistent with a traumatic vacuum[-]assisted vaginal delivery with shoulder dystocia." Dr.
Seals provides the remainder of the factual basis for causation when he states that 

 Erb's Palsy is a condition which is the result of a traumatic stretch injury to
the brachial plexus during the birth process. It is well accepted that the
mechanics of the injury include lateral flexion of the head while the shoulder
is being held fixed against the mother's pelvic rim during the birthing process. 
Logically this is the only sequence of events that can adequately explain the
forces necessary to result in the avulsion of nerve roots in the cervical spine
region during birth. 


Dr. Autrey's conclusions then complete the causation analysis when he states that the
"departures from the standard of care by [Dr. Otero] were the direct and foreseeable
(proximate) cause of the injuries to Daniela Carmona" and that "Daniela Carmona's
brachial plexus injury, the left clavicle fracture, left Erb's palsy with subsequent surgery and
the multiple physical therapy sessions required to attempt to improve her left arm and left
hand function were avoidable and are a direct and foreseeable result of the inappropriate
(negligent) use of the vacuum extractor." 

 We conclude that, when read together, Leon's expert reports explain that a birth
involving shoulder dystocia--"the shoulder [of the baby] . . . being held fixed against the
mother's pelvic rim during the birthing process"--should foreclose the use of a vacuum
because the "mechanics of the [Erb's palsy] injury include lateral flexion of the head" while
the baby's head is fixed against the mother's pelvis and a resulting "traumatic stretch injury
to the brachial plexus during the birth process." See Windsor v. Maxwell, 121 S.W.3d 42,
48 (Tex. App.-Fort Worth 2003, pet. denied) (holding that a report is sufficient if it "contains
information summarizing and explaining the causal relationship between the doctor's failure
to meet the applicable standards of care and the plaintiff's injury"); see also Barrerra v.
Rico, No. 13-04-00480-CV, 2008 WL 4823991, at *5-6 (Tex. App.-Corpus Christi Nov. 6,
2008, pet. denied) (mem. op.) (holding that plaintiff's report was sufficiently specific as to
causation where the expert included facts regarding the use of excessive traction and
stretching, tearing, and avulsion of the infant's shoulder, arm, and hand). In light of the
foregoing facts, we also conclude that the expert reports adequately describe how
Daniela's fractured clavicle is "consistent with a traumatic vacuum[-]assisted vaginal
delivery with shoulder dystocia." In sum, looking only to the four corners of her reports, we
conclude that Leon adequately addressed causation. See Palacios, 46 S.W.3d at 878. 
The statements in the reports related to causation are not conclusory but, in fact, provide
a factual basis linking Dr. Otero's breach to Daniela's claimed injuries. See Bowie Mem'l
Hosp., 79 S.W.3d at 52-53. 

4. Conclusion

 Thus, the trial court did not abuse its discretion in denying Dr. Otero's motion to
dismiss. We hold that Leon's report adequately identified the applicable standard of care
and Dr. Otero's breach and explained how the breach caused Daniela's injuries. See
Palacios, 46 S.W.3d at 878. The report was a good faith effort to comply with the statute
because it put Dr. Otero on notice of the specific conduct complained of and provided the
trial court a basis on which to conclude the claims have merit. See id. at 879; Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(l). Dr. Otero's first issue is overruled. 

 Having concluded that Leon's expert reports were sufficient as to Dr. Otero and that
the trial court did not err in denying his motion to dismiss on that basis, we do not reach Dr.
Otero's issue regarding attorneys' fees. (6) See Tex. Civ. Prac. & Rem. Code Ann. §
74.351(b).

B. McAllen Hospitals and Dr. Leal

1. Waiver 

 By McAllen Hospital's sole issue and Dr. Leal's second, both parties complain that
Leon's amended expert reports were inadequate under section 74.351 and that the trial
court thus erred in denying their motions to dismiss her claims. However, we do not reach
their complaints because we have concluded that both McAllen Hospitals and Dr. Leal
waived them by failing to object to the amended reports within twenty-one days of service. 
See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

 In a recent, remarkably similar case, the Beaumont Court of Appeals addressed a
situation in which multiple defendants objected to the initial expert report filed by the
claimant but only the co-defendants of the appellant doctor pursued their objections to
hearings before the trial court. Gordon v. Sebile, No. 09-10-00007-CV, 2010 WL 1610758,
at *1 (Tex. App.-Beaumont Apr. 22, 2010, no pet.). After the hearings, the trial court,
referencing only the co-defendants, granted the claimant a thirty-day extension to file an
amended expert report, which was then served on all the parties. Id. Only the co-defendants filed objections to the amended report. Id. The court decided that the
appellant doctor waived his complaint regarding the adequacy of the amended expert
report because he failed to object to the amended report. Id. at *3. The court stated that
section 74.351(a)

 requires physicians "whose conduct is implicated in a report" to file "any
objection to the sufficiency of the report not later than the 21st day after the
date it was served." In our opinion, when a party files an expert report
pursuant to the trial court's express permission in order to cure a deficient
report, the new expert report constitutes "a report" within the meaning of
section 74.351(a), thus triggering the physician's or health care provider's
obligation to file specific objections to the new report within twenty-one days
of being served with the report. If no objections are filed to a report that
implicates the physician[ or health care provider]'s conduct, by the plain
wording of the statute, "all objections are waived." In our opinion, and in light
of the clear language of the statute, whether exceptions should exist to the
legislatively created waiver is a matter best left to the Legislature.

Id. (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)); see also HealthSouth Corp. v.
Searcy, 228 S.W.3d 907, 909 (Tex. App.-Dallas 2007, no pet.) (holding that an amended
expert report "supplants" the previously filed report and that there was nothing for the court
to review where the defendant health care provider did not object to the amended report);
Desai v. Garcia, No. 09-06-00332-CV, 2006 WL 3627008, at *2 (Tex. App.-Beaumont
Dec. 14, 2006, no pet.) (mem. op.) (affirming denial of doctor's motion to dismiss where
he failed to timely object to amended expert report). We agree with our sister courts.

 The amended expert reports implicated the conduct of both McAllen Hospitals and
Dr. Leal. Although both McAllen Hospitals and Dr. Leal objected to the initial expert reports
served by Leon, neither objected to the amended reports served after the trial court
granted Leon a thirty-day extension. They thus waived any objection regarding the
adequacy of her reports, and we cannot conclude that the trial court abused its discretion
in denying McAllen Hospitals and Dr. Leal's motions to dismiss. See Gordon, 2010 WL
1610758, at *3. Their issues related to the sufficiency of Leon's expert reports are
overruled.

2. Timeliness 

 By his first issue, Dr. Leal argues that Leon's amended reports were untimely
because the trial court's order granting Leon a thirty-day extension to amend referenced
only Dr. Otero. Dr. Leal argues that, in light of this order, we should only consider Leon's
initial expert reports when determining whether Leon complied with the expert report
requirement in her claims against Dr. Leal. We are unpersuaded by Dr. Leal's argument. 
An amended expert report served after a thirty-day extension granted by the trial court
supercedes the initial report filed by the claimant. See HealthSouth Corp., 228 S.W.3d at
909 (citing CIGNA Ins. Co. v. TPG Store, Inc., 894 S.W.2d 431, 434 (Tex. App.-Austin
1995, no writ)). It matters not that the order granting the extension referenced only Dr.
Otero. See id. We conclude, as did our sister court in Gordon, that the amended report
applied to all of the defendants. See Gordon, 2010 WL 1610758, at *3 (declining to adopt
the appellant doctor's argument that the amended report was untimely as to him even
where the thirty-day extension was expressly granted in light of his co-defendant's
objections). Dr. Leal's first issue is overruled.IV. Conclusion

 The order of the trial court denying appellants' motions to dismiss is affirmed.


 NELDA V. RODRIGUEZ

 Justice


Delivered and filed the

15th day of July, 2010.

1. Appellee Faride Leon is also known as Faride Carmona.
2. "Cephalhematoma" is a "blood cyst often occurring in newborn infants after normal delivery with no
apparent trauma; blood accumulates between a single cranial bone and its lining membrane" and is "gradually
absorbed, becomes firmer and smaller, and disappears by three months." Ida G. Dox et al., Attorney's
Illustrated Medical Dictionary C34 (1997). "Macrosomic" refers to an "abnormally large" body size, "such
as that of a newborn infant of a diabetic mother." Id. at M2. 
3. The "clavicle" is the collar bone, i.e., the "long curved bone nearly horizontally placed nearly
horizontally above [the] first rib." Id. at B21. Erb's palsy is defined as "[p]aralysis of the upper musculature
of an infant's arm . . . caused by injury to the brachial plexus . . . during birth . . . [that is] usually associated
with difficult breech delivery or forceps delivery." Id. at P4.
4. No reporter's record of that hearing appears in the appellate record. Leon did not respond to the
objections and motions to dismiss filed by Dr. Leal and McAllen Hospitals.
5. "Primigravida" is defined as a "woman who has been pregnant only once." Id. at P72.
6. We note that Dr. Otero has named Leon's attorney as a party to this appeal, presumably in an
attempt to collect fees and costs directly from Leon's attorney. But we have determined that attorneys' fees
are unavailable because the trial court has not yet dismissed Leon's suit; therefore, we decline to address the
issue of whether section 74.351(b) permits the recovery of attorney's fees from a claimant's attorney. See
Salinas v. Dimas, 310 S.W.3d 106, 2010 Tex. App. LEXIS 1987, at *14-15 (Tex. App.-Corpus Christi Mar.
18, 2010, pet. denied); Haddad v. Marroquin, No. 13-08-00139-CV, 2009 WL 2192737, at *4 (Tex.
App.-Corpus Christi July 23, 2009, pet. denied) (mem. op.).