In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-25-00044-CV**

**CHI ST. LUKE'S COMMUNITY HEALTH
SERVICES – THE WOODLANDS HOSPITAL, Appellant**

**V.**

**SHARON SMITH, Appellee**

_____

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 24-04-06465-CV**

_____

**MEMORANDUM OPINION**

This is an interlocutory accelerated appeal from the trial court's order overruling the objections of Defendant CHI St. Luke's Community Health Services – The Woodlands Hospital ("Appellant" or "SLWH") to Plaintiff Sharon Smith's ("Appellee" or "Smith") second amended Chapter 74 expert report and denying SLWH's motion to dismiss Smith's health care liability claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *see also id.* § 51.014(a)(9) (providing for interlocutory

appeal of an order denying relief under section 74.351). SLWH timely filed this appeal, arguing that the trial court erred in overruling its objections and in failing to dismiss Smith's health care liability claim. We affirm.

Background

Allegations in Smith's Petition

On April 24, 2024, Smith filed her Original Petition stating claims for negligence and gross negligence against Defendants Katherine Luu, MD, Katherine Luu, MD, PLLC, and Steven Ellis, DO,[1] related to their care and treatment of Smith, and claims against "St. Luke's Community Health Services, St. Luke's Health System Corporation, and St. Luke's The Woodlands Hospital"[2] for negligence and gross negligence under the doctrine of respondeat superior.

According to the petition, Smith was initially treated at SLWH on May 20, 2023, complaining of a headache, high blood pressure, and numbness and tingling in the right side of her body. Dr. Luu evaluated Smith at 8:13 p.m., and Dr. Luu noted that Smith had a sensory deficit to her right face, right arm, and right leg. Dr.

---

[1] Defendants Katherine Luu, MD, Katherine Luu, MD, PLLC, and Steven Ellis, DO are not parties to this appeal. We only discuss those parties, Smith's claims against those parties, and pleadings as to those parties as necessary to provide background and to address SLWH's issue on appeal.

[2] Defendant SLWH answered the suit acknowledging that it had been incorrectly named in the suit as "St. Luke's Community Health Services, St. Luke's Health System Corporation, and St. Luke's The Woodlands Hospital[;]" therefore, we refer to the defendant hospital as SLWH when discussing the allegations in the petition.

Luu assigned Smith a score of "one" on the National Institutes of Health Stroke Scale ("NIHSS") and "ordered a CT brain, CT angiogram (CTA) brain, and CTA carotid, noting the indication for these studies as hypertensive emergency and right-sided numbness." The petition states that Dr. Luu ordered hydralazine 10mg IV for Smith's hypertension, which was administered at 8:34 p.m., and the CT scans were completed at 9:48 p.m. According to the petition, at 11:01 p.m., Dr. James Reese reported that the CT studies reflected "no acute intracranial abnormality or large vessel occlusion." Dr. Luu reassessed Smith at 11:47 p.m., documenting that Smith continued to have right-sided numbness, but that it had improved since Smith's arrival at the hospital. Dr. Luu diagnosed Smith with hypertensive emergency and right-sided numbness and ordered her to be discharged. In her discharge instructions, Dr. Luu advised Smith that her CT scans did not show evidence of a stroke and that her symptoms were likely related to high blood pressure. Smith left the hospital's emergency department at 11:45 p.m.

The petition states that on May 21, 2023, at 12:12 p.m., Smith returned to the SLWH emergency department, and Smith was examined by Dr. Steven Ellis. Dr. Ellis noted that Smith reported that at 4:00 a.m. she started having slurred speech, right-sided weakness, and right facial droop. Dr. Ellis noted that Smith had right-sided facial droop, right arm and leg weakness, and slurred speech, and he assigned her a score of "five" on the NIHSS. Dr. Ellis noted that he reviewed Smith's CT

3

scans from May 20th, and Smith was admitted to the hospital with a diagnosis of facial droop, slurring speech, right arm weakness, and right leg weakness.

The petition states that later Dr. Lucy Buencamino evaluated Smith and noted that Smith was unable to have an MRI secondary to neck hardware and documented a plan to consult neurology on the morning of May 22nd if Smith's symptoms persisted. At approximately 11:50 p.m. on May 21st, Smith and her family signed Smith out of SLWH against medical advice from the emergency department noting on the AMA form that "care here is less than standard[.]"

Smith presented to Houston Methodist Hospital at 12:25 a.m. on May 22nd and was examined by Dr. Aric Bakshy at 12:52 a.m. According to the petition, Dr. Bakshy noted that Smith "exhibited right arm and leg weakness, right arm numbness, dysarthric speech, and right-sided facial 3 numbness and weakness[,]" and that her symptoms were consistent with a stroke. The stroke team was contacted at 1:05 a.m. and, as part of her stroke evaluation, Smith underwent a "CT head [and] CTA head/neck[.]" The testing indicated Smith suffered "a stroke involving the left thalamocapsular region and a severe stenosis of the P2 segment of the left posterior cerebral artery (PCA)." The petition states that the providers at Houston Methodist concluded that Smith was not a candidate for thrombolytic therapies because her symptoms were "outside the 4.5 hour window." Smith was hospitalized until May 28, 2023, when she was discharged to TIRR Memorial Hermann inpatient rehab.

4

The petition asserts that Smith still suffers from symptoms from her stroke which impede her personal and work life.

Smith's petition alleges that Dr. Luu's and Dr. Ellis's treatment of Smith fell below the standard of care and that they breached the standard of care "by failing to follow the necessary protocols required for any patient exhibiting potential stroke symptoms." The petition also alleges that SLWH is liable for Dr. Luu's and Dr. Ellis's actions to the extent SLWH was an employer or was in control of "any of the systems by which these doctors made their decisions for Ms. Smith," and that Katherine Luu, MD, PLLC, is liable to Smith to the extent that Dr. Luu was operating as an agent or employee of Katherine Luu, MD, PLLC. Smith's petition asserts that the acts and omissions of the defendants proximately caused Smith's injuries.

Specifically as to Dr. Luu, Smith alleged that Dr. Luu breached the standard of care by:

- [f]ailing to initiate stroke protocol[;]
- [f]ailing to consult a neurologist and/or stroke team when Ms. Smith presented complaining of stroke symptoms[;]
- [f]ailing to ensure the CT of the head and CTA brain/carotid was ready timely in compliance with acute stroke protocol by ordering the studies for indication of hypertensive emergency and right sided numbness which resulted in their completion 1 hour and 45 minutes later and their interpretation 2 hours and 58 minutes after Ms. Smith arrived to the emergency room[;]
- [f]ailing to offer or recommend thrombolytics to Ms. Smith, who was an appropriate candidate[;and]
- [f]ailing to diagnose Ms. Smith with an acute stroke and admitting her to the hospital.

5

As to Dr. Ellis, in the petition Smith alleged that Dr. Ellis breached the standard of care by:

- [f]ailing to diagnose Ms. Smith with a stroke[;]
- [f]ailing to obtain a repeat CT when he found Ms. Smith's NIHSS score increased[;and]
- [f]ailing to admit Ms. Smith under a stroke protocol, thereby not ensuring she was evaluated by neurology and instead had her admitted under hospitalist service.

Additionally, Smith alleged that SLWH had the right to control "the means and details" of doctors with whom it contracts, like Dr. Luu and Dr. Ellis, to provide emergency medicine at its facility, and that it was negligent in failing to ensure that Dr. Luu and Dr. Ellis were sufficiently following the appropriate standard of care. According to Smith, at the time of their improper care of Smith, Dr. Luu and Dr. Ellis were acting within the course and scope of employment and as agents of SLWH.

Smith contends that the defendants were grossly negligent in treating Smith by failing to follow the stroke protocol for a comprehensive stroke center. In the petition, Smith further alleges that Smith presented to SLWH with "symptoms indicative of a stroke and was a candidate for thrombolytics" but Dr. Luu and Dr. Ellis failed to formally diagnose Smith with a stroke, initiate a stroke protocol, and timely consult neurology. According to Smith, the defendants "robb[ed] her of a chance at the best possible outcome when she presented to the emergency department with alarming and then worsening symptoms."

6

Smith sought damages for physical pain and suffering, mental pain and suffering, loss of consortium, physical impairment, physical disfigurement, inconvenience, loss of enjoyment of life, reasonable and necessary past and future medical bills, lost wages and lost earning capacity. Attached to the petition is an expert report from Dr. Brian Pisula along with his curriculum vitae.

SLWH's Answer and Objections to Dr. Pisula's Initial and First Amended Expert Report

SLWH filed an Answer, stating it was incorrectly named as "St. Luke's Community Health Services, St. Luke's Health System Corporation, and St. Luke's The Woodlands Hospital[,]" and generally denying Smith's allegations and asserting affirmative defenses. SLWH also filed Objections to Plaintiff's Chapter 74 Report of Brian Pisula, MD. In response, Smith filed the First Amended Chapter 74 Report of Brian Pisula, MD. SLWH filed Objections to Plaintiff's First Amended Chapter 74 Report of Brian Pisula, MD and Motion to Dismiss. Smith filed a response to the objections and motion to dismiss, and SLWH filed a reply to Smith's response.

After a hearing on SLWH's Objections to Plaintiff's First Amended Chapter 74 Report of Brian Pisula, MD and Motion to Dismiss, on November 14, 2024, the trial court and the parties signed an Agreed Order. The Agreed Order states that the trial court sustained SLWH's objections in part because Pisula's first amended report did not comply with section 74.351 because his opinion as to causation is speculative and conclusory. The court granted Smith a thirty-day extension to cure the defects.

7

*See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). The trial court denied SLWH's Motion to Dismiss.

Dr. Pisula's Second Amended Chapter 74 Report[3]

In the Second Amended Chapter 74 Report of Dr. Pisula, a board-certified emergency doctor, Dr. Pisula described his qualifications for rendering his expert opinions in this case, described the factual and medical background in the case, and offered the following opinions and conclusions:

Opinions

The standard of care for emergency physicians in initially evaluating patients with stroke symptoms is to promptly determine the patient's "last known well" time and perform a comprehensive neurological examination. If the examination is consistent with a stroke and symptom onset is within 4.5 hours of presentation to the emergency department, a "code stroke" protocol must be activated. Code stroke protocols consist of rapid consultation of a neurologist and/or stroke team, rapidly obtaining a CT without contrast of the head with expedited interpretation of the CT results, and administration of a thrombolytic medication if the patient is determined to be a candidate.

The American Heart Associat[ion] St[r]oke Target guidelines as well as the National Institute of Neurological Disorders and Stroke recommend the following targets for [a] patient presenting with stroke symptoms presenting within 4.5 hours of symptom onset: ≤ 10 minutes to initial physician evaluation, ≤ 15 minutes to stroke team/neurology consultation, ≤ 25 minutes to head CT, ≤ 45 minutes to interpretation of neurological imaging, ≤ 60 minutes to initiation of thrombolytic therapy.

---

[3] The trial court ultimately dismissed Smith's claims against Steven Ellis, DO, without prejudice, and therefore Smith's vicarious liability claims against SLWH cannot be based on Smith's allegations against Dr. Ellis, so we omit any further analysis of Dr. Pisula's second amended report relating to Dr. Ellis.

8

Ms. Smith presented to [SLWH] on May 20, 2023 at 8:03 pm. Dr. Luu evaluated Ms. Smith at 8:13pm and documented that Ms. Smith's symptoms of right-sided numbness had started one hour prior to arrival. Dr. Luu performed a neurological examination, documenting that Ms. Smith had objective numbness in her right arm, leg, and face. Despite documenting that Ms. Smith's symptoms had started within one hour of presentation to the E[mergency] D[epartment] and that she had objective sensory loss to the right-side of her body, Dr. Luu did not activate a code stroke protocol. Dr. Luu did not consult a neurologist and/or a stroke team to evaluate Ms. Smith. While Dr. Luu did order a CT of the head as well as CTA brain/carotid, she ordered these studies for the indication of hypertensive emergency and right-sided numbness, not as part of an acute stroke protocol. As a result, these studies were not completed until 9:48 pm, 1 hour and 45 minutes after Ms. Smith's presentation to the ED, and were not interpreted until 11:01pm, 2 hours and 58 minutes after Ms. Smith's arrival to the ED. Dr. Luu's failure to order Ms. Smith's CT scans as acute stroke protocols to ensure timely completion and interpretation was a breach of the standard of care. Additionally, Dr. Luu's failure to promptly consult a neurologist and/or stroke team was a breach of the standard of care.

Dr. Luu ultimately discharged Ms. Smith from the ED at 11:45pm with a diagnosis of hypertensive emergency and right-sided numbness, not an acute stroke. While Dr. Luu noted that she offered admission to Ms. Smith for blood pressure monitoring and neurological checks, she never offered or recommended administration of thrombolytics. Ms. Smith was an appropriate candidate for thrombolytic therapy. She presented within 4.5 hours of symptom onset, had a measurable neurological deficit as evidence[d] by her score of 1 on Dr. Luu's NIHSS, her CT scan did not show hemorrhage or evidence of irreversible injury, and although her initial blood pressure was significantly elevated at 223/98, it reduced briskly to 162/64 by 9:00pm after receiving a dose of hydralazine 10mg IV. Dr. Luu breached the standard of care by failing to diagnose Ms. Smith with an acute stroke, failing to offer thrombolytic therapy, and failing to admit Ms. Smith to the hospital.

Additionally, Dr. Luu advised Ms. Smith in her discharge papers that her symptoms were likely related to elevated blood pressure. Notably, Ms. Smith's blood pressure had significantly lowered during her time in the ED and was down to 153/96 at 10:30 pm. However, despite this

9

reduction in blood pressure, Dr. Luu documented on reassessment that Ms. Smith still had, albeit improved, right-sided numbness. The continued presence of right-sided numbness despite a substantial reduction in Ms. Smith's blood pressure was exclusionary of her symptoms being definitely related to her blood pressure. Moreover, if Ms. Smith had actually been suffering from a hypertensive emergency with associated neurological deficits, the appropriate management would have been for her to be admitted to an ICU setting for blood pressure management, repeated neurological checks, neurology consultation, and MRI imaging of the brain. Dr. Luu breached the standard of care by inappropriately reassuring Ms. Smith that her symptoms were related to hypertension rather than an acute stroke.

Dr. Luu also advised Ms. Smith that her CT scans did not show[] signs of a stroke. However CT imaging in the setting of [] acute stroke symptoms is not utilized to diagnose or exclude a stroke. Rather, the initial head CT is used to screen for alter[n]ative causes of the patient's symptoms and for exclusion criteria for thrombolytic therapy. Dr. Luu breached the standard of care by inappropriately relying on a normal CT of the head to exclude acute stroke and inappropriately reassuring Ms. Smith that a negative CT of the head could be utilized to exclude acute stroke.

. . . .

[SLWH] is a facility equipped to treat stroke patients. Hospitals that hold themselves out to be stroke centers must have a stroke protocol in place to ensure that the standard of care is met for patients presenting with acute stroke. The hospital staff must also have the appropriate training, information, and resources to ensure that the protocol is followed. [SLWH] either failed to have an appropriate stroke protocol in place, or it was inadequate in that it failed to properly ensure the appropriate recognition and treatment of Ms. Smith's stroke.

The breaches in the standard of care enumerated above caused a delay in diagnosis and treatment of Ms. Smith's stroke. By failing to ensure that a code stroke protocol was activated, Ms. Smith did not undergo a CT head until 1 hour and 45 minutes after arrival and it was not interpreted until almost 3 hours after her arrival. The standard of care dictates that a head CT should be completed within 25 minutes and

10

interpreted by radiology within 45 minutes of arrival to the Emergency Department in a patient presenting with stroke symptoms. Rapidly obtaining the CT allows clinicians to determine if a patient has any exclusion criteria to treatment with thrombolytic therapy which, if the patient is eligible, must be administered within 4.5 hours of the patient's "last known well" time. In this case, due to the failure of the providers to follow the stroke protocol timeline, Ms. Smith lost her opportunity to be given thrombolytic therapy during the time period that was appropriate. Ms. Smith presented with acute stroke symptoms with a last known normal of one hour prior to ED presentation. Rapid CT head imaging should have obtained within 25 minutes to rule-out exclusion criteria for thrombolytic therapy. Additionally, neurology should have been emergently consulted to evaluate Ms. Smith for treatment with thrombolytic therapy. Dr. Luu failed to ensure that the CT of the head was obtained and interpreted in the appropriate timeframe and failed [to] ensure that Ms. Smith was evaluated for treatment with thrombolytics. These breaches caused Ms. Smith to lose the opportunity to [be] treated with thrombolytics in a timely fashion. Had Dr. Luu followed the standard of care for patients presenting to the emergency department with acute stroke symptoms, Ms. Smith would have likely received thrombolytic therapy and had an improved neurological outcome.

. . . The failure to accurately diagnose Ms. Smith with an acute stroke and activate a stroke protocol also resulted in a delay in neurology consultation and initiation of standard post-stroke care including aspirin, blood pressure monitoring and treatment, and risk factor modification.

The Houston Methodist Hospital records show that the stroke team was activated rapidly upon Ms. Smith's presentation to the ED. This allowed the providers to obtain lab work, imaging, and prompt neurology consultation. Although Ms. Smith was no longer a candidate for thrombolytic therapy, a code stroke protocol was properly initiated based on her focal neurological deficits.

Conclusion

It is my opinion that Dr. Luu breached the standard of care in her evaluation and management of Ms. Smith for her stroke symptoms. Dr.

11

Luu's failure to properly diagnose Ms. Smith's stroke and initiate a code stroke protocol resulted in Ms. Smith losing her best chance at preventing progression of her stroke.

. . . Ms. Smith did not receive an accurate diagnosis and neurology consult until two days after symptom onset, when she presented to the Houston Methodist emergency department, wherein appropriate symptom management began by initiating a code stroke protocol.

These breaches were the proximate cause of the delay in diagnosis of Ms. Smith's stroke. Ms. Smith's damages could have been prevented and/or mitigated had she been timely diagnosed with an acute stroke and a code stroke protocol initiated promptly.

I hold these opinions to a reasonable degree of medical probability. I also reserve the right to amend them should additional information be provided to me.

SLWH's Objections to Plaintiff's Second Amended Report and Motion to Dismiss

SLWH filed Objections to Plaintiff's Second Amended Chapter 74 Report of Brian Pisula, MD and Motion to Dismiss. SLWH objected to Dr. Pisula's second amended expert report, arguing that the report remains speculative and conclusory, fails to sufficiently explain the causal relationship between Dr. Luu's alleged negligent actions and Smith's injuries, remains silent on any injuries caused by SLWH's alleged negligence, and is not a good faith effort to comply with the requirements of section 74.351.[4] According to SLWH, Dr. Pisula fails to identify the

_____

[4] SLWH also argued "out of an abundance of caution[]" that, although Smith brought vicarious liability claims against SLWH, Dr. Pisula's second amended report fails to adequately address the standard of care and breach of the standard of care as to SLWH. Because on appeal SLWH only challenges the report's sufficiency on causation for purposes of Smith's vicarious liability claims against SLWH, we

12

injuries Smith suffered from the alleged stroke and how the alleged delay in diagnosis and treatment caused Smith's injuries. SLWH contends that the report is silent on the actual neurological deficits Smith allegedly suffered from the alleged breaches of the standard of care and does not identify what thrombolytic therapy is, how it works to treat a stroke, or how it would have improved Smith's outcome. Specifically, SLWH argues that the report does not identify Smith's current neurological deficits or the expected improvements she would have benefited from with thrombolytic therapy. SLWH also moved to dismiss Smith's healthcare liability claim as to SLWH with prejudice on the basis that Dr. Pisula's second amended expert report is insufficient to fulfill the requirements of Chapter 74 as to SLWH.

Defendants Katherine Luu, MD, Katherine Luu, MD, PLLC, and Steven Ellis, DO, also filed objections to Dr. Pisula's second amended expert report. Because they are not parties to this appeal, we do not discuss herein their objections or Smith's responses to those objections.

Smith's Response to SLWH's Objections to Second Amended Report and Second Motion to Dismiss

In her response in the trial court, Smith alleges that the expert report is not required to marshal all the evidence as if it were litigating the merits, Dr. Pisula's second amended report details how the breaches of the standard of care caused and

---

do not include a discussion of SLWH's arguments about its standard of care and alleged breach of that standard.

13

contributed to Smith's injury, and that the report is a good faith effort to adequately explain that the case has merit. According to Smith, Dr. Pisula describes in the report Smith's symptoms (numbness, slurring of speech, right facial droop) in order to explain how those symptoms should have triggered a code stroke protocol but they are also key to understanding how the failure to follow the standard of care prevented Smith's chance at stopping the eventual stroke and/or the progression of those symptoms, the timely use of thrombolytic therapy is to try and eliminate a clot before it can lead to a major stroke, and Smith was a candidate for that therapy. Smith argues that the report identifies her injuries suffered by the alleged stroke by stating that "These breaches were the proximate cause of the delay in diagnosis of Ms. Smith's stroke. Ms. Smith's damages could have been prevented and/or mitigated had she been timely diagnosed with an acute stroke and a code stroke protocol initiated promptly." Smith contends that, in other words, the stroke itself is the damage suffered by Smith due to the breach of the standard of care, and that the report explains that Pisula's report explains that code stroke protocol should occur as soon as possible and does not necessitate that the stroke have happened already. Smith explains that Pisula's "thorough explanation of the code stroke protocol shows how imperative it is to determine whether a patient is a candidate for thrombolytic therapy *before* they have a stroke if they present timely, as Ms. Smith did." Smith also argues that Chapter 74 requires opinions only as to liability and causation and

14

does not require an explanation of all the harm that flows from a plaintiff's injury. As for SLWH's argument that Dr. Pisula's report has not identified a direct liability theory as to SLWH, Smith argues that this argument was addressed in her responsive motion to SLWH's first Motion to Dismiss and at the subsequent hearing, that the Texas Supreme Court "has regularly addressed this issue[,]" and that so long as her expert report complies with Chapter 74's expert report requirements for a viable liability theory, the report is sufficient as to Smith's claims for vicarious liability as to SLWH.

SLWH's Reply to Smith's Response

In its Reply to Smith's Response, SLWH argues that Smith has mischaracterized Dr. Pisula's report by claiming that Dr. Pisula's explanation of the stroke protocol demonstrates that it is imperative to timely determine whether a patient is a candidate for thrombolytic therapy. According to SLWH, Dr. Pisula's report does not state that the defendants' actions caused Smith to have a stroke, but instead states that Pisula believes a patient must be diagnosed with or have a stroke before the stroke protocol can be activated and thrombolytic therapy administered, and the breaches in the standard of care set out in the report caused a delay in the diagnosis and treatment of Smith's stroke and that the claim is essentially that she lost her opportunity to be given thrombolytic therapy during an appropriate time. SLWH argues that although Dr. Pisula is not required to marshal all proof or detail

15

the harm that flowed from Smith's alleged injury, he has failed to identify any injury beyond the loss of chance of an improved outcome by the alleged failure to timely diagnose and treat the alleged stroke with thrombolytic therapy. According to SLWH, Dr. Pisula generally claims that Smith's damages could have been mitigated if she were timely diagnosed, and if Dr. Luu had ordered and followed the stroke protocol, Smith "likely" would have received thrombolytic therapy and would have had an improved neurological outcome. According to SLWH, these statements amount to nothing more than mere conjecture, and Dr. Pisula's opinion on causation is wholly deficient because he fails to identify any injury suffered by Smith that was caused by Dr. Luu or SLWH. SLWH also argues that, as to Dr. Pisula's opinion that the alleged breaches of standard of care caused Smith to lose the opportunity to receive thrombolytic therapy, Texas does not recognize a common law cause of action for the "loss of chance" in medical malpractice claims. SLWH contends that recovery for a loss of chance requires proof that at the time of the alleged negligent action there was less than a 50% chance the claimed injuries would have occurred without the negligence, and Dr. Pisula's report does not show that Smith had a less than 50% chance of an injury without the alleged delay in diagnosing an acute stroke and initiation of thrombolytic therapy. SLWH further argues that Pisula, in stating that Dr. Luu's failure to properly diagnose a stroke resulted in Smith losing her "best" chance at preventing the progression of a stroke with the use of thrombolytic

16

therapy, does not define what is meant by "best" and does not address the percentage of patients who benefit from thrombolytic therapy or address the risks of the therapy.

Trial Court's Order

After a hearing on January 17, 2025, the trial court signed an Order on Motions to Dismiss wherein the trial court dismissed any and all direct liability claims asserted by Smith against SLWH and stated that Smith's vicarious liability claims against SLWH "remain pending[.]" The Order on Motions to Dismiss also dismissed any or all of Smith's claims against Dr. Ellis, but denied the Motion to Dismiss filed by Katherine Luu, MD and Katherine Luu, MD, PLLC. SLWH filed a notice of interlocutory appeal. Dr. Luu did not file a notice of appeal.

Issue on Appeal

In a single issue on appeal, SLWH argues the trial court abused its discretion in failing to dismiss Smith's vicarious liability claims against SLWH. SLWH contends that Dr. Pisula's Second Amended Expert Report inadequately addresses the cause of Smith's injuries. Specifically, SLWH argues that for Smith to maintain a vicarious liability claim against SLWH, Dr. Pisula's report must adequately address causation against Dr. Luu because the trial court dismissed Smith's claims against Dr. Ellis. SLWH also asserts that Dr. Luu was not an employee of SLWH at the time of Smith's care and SLWH did not train, educate, instruct, supervise or control Dr. Luu's medical decisions at the time of Smith's care. According to

17

SLWH, Dr. Pisula's causation opinion as to Dr. Luu is speculative and conclusory and contains analytical gaps, making the report deficient as to Smith's vicarious liability claims against SLWH. SLWH also argues that under *Kramer v. Lewisville Memorial Hospital*,[5] Texas does not recognize a common law cause of action for loss of chance in a healthcare liability claim and that, like the expert report in *Varkey v. Melhem*,[6] Dr. Pisula's expert report does not show that Smith had less than a 50% chance of suffering an injury without negligence. SLWH does not challenge Dr. Pisula's qualifications or the standard of care or the alleged breach of that standard.

In response, Smith maintains that Texas law does not require a separate report when vicarious liability is at issue and that expert doctors are not required to opine regarding business relationships at this preliminary stage. Smith asserts that she has not pled a loss of chance theory, and this case is distinguishable from *Varkey*, the case that SLWH relies on in arguing otherwise. According to Smith, Dr. Pisula's report explains the conduct of Dr. Luu which is being criticized and why Dr. Luu's inaction was the cause of Smith's damage, and the report includes a thorough breakdown of how Dr. Luu breached the standard of care and details the escalation of Smith's symptoms after being seen by Dr. Luu. Smith argues that she has shown she has a meritorious claim, she complied with Chapter 74's expert report

---

[5] 858 S.W.2d 397, 400 (Tex. 1993).
[6] No. 14-20-00186-CV, 2022 Tex. App. LEXIS 5665 (Tex. App.—Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.).

requirements, and that this is not the appropriate time for SLWH's arguments that are defenses beyond the scope of the initial expert report stage.

Standard of Review

In health care liability cases, we review a trial court's ruling on a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A trial court's ruling does not constitute an abuse of discretion simply because the appellate court would have ruled differently under the circumstances. *See id.* A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).

In reviewing a report's sufficiency under this standard, "we consider only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 878). In determining whether the report contains the requisite information, we view the entirety of the report rather than isolating

specific portions or sections. *See Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018); *Van Ness*, 461 S.W.3d at 144.

Expert Report Under Chapter 74

Chapter 74 of the Civil Practice and Remedies Code, also known as the Texas Medical Liability Act ("the Act"), requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims. *Abshire*, 563 S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 877); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) ("[Expert report] requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed.") In accordance with that purpose, the Act provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

An expert report is sufficient under the Act if it "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care [that was] rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury[.]" Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *see Jelinek v. Casas*, 328 S.W.3d 526, 538-40 (Tex. 2010);

20

*Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Palacios*, 46 S.W.3d at 875, 879. The trial court need only find that the report constitutes an "objective good faith effort" to comply with the statutory requirements. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l); *see also Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 878. The Texas Supreme Court has held that an expert report demonstrates a "good faith effort" when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty*, 543 S.W.3d at 693-94. A report "'need not marshal all the claimant's proof,' but 'a report that merely states the expert's conclusions about the standard of care, breach, and causation'" is insufficient. *Abshire*, 563 S.W.3d at 223 (quoting *Palacios*, 46 S.W.3d at 878-79). In determining the adequacy of an expert report, a court reviews the pleadings to determine the claims alleged and whether the report addresses those claims. *See Christus Health Se. Tex. v. Broussard*, 306 S.W.3d 934, 938 (Tex. App.—Beaumont 2010, no pet.) (citing *Windsor v. Maxwell*, 121 S.W.3d 42, 51 (Tex. App.—Fort Worth 2003, pet. denied)). The report must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539-40.

Analysis

SLWH's primary challenge to the second amended report pertains to causation. SLWH argues that Dr. Pisula's report is inadequate as to causation

21

because his opinion as to Dr. Luu is speculative and conclusory and contains analytical gaps, making the report deficient as to Smith's vicarious liability claims against SLWH. Specifically, SLWH contends that Pisula completely fails to opine that it was "more likely than not" that if Smith would have received thrombolytic therapy she would not have sustained injuries from her stroke or that she would have had an improved neurological outcome with initiation of thrombolytic therapy by Dr. Luu, and that speculative phrases such as "los[s] [of] opportunity" and "would have likely" as used in Pisula's report are insufficient to meet the requirements of Chapter 74. SLWH also argues that Dr. Pisula's report does not link Dr. Luu's alleged failure to initiate a code stroke protocol to Smith's ultimate harm, that the report concludes Smith was an appropriate candidate for thrombolytic medication without identifying the criteria that makes a patient a candidate; and that the report fails to explain thrombolytic therapy and how it would have improved Smith's neurological outcome.

The Act requires an expert report to address causation—"how and why" the alleged negligence caused the injury in question. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 224 (quoting *Jelinek*, 328 S.W.3d at 536). A conclusory statement of causation is inadequate, and the expert must explain the basis of his statements and link conclusions to specific facts. *Abshire*, 563 S.W.3d at 224; *Jelinek*, 328 S.W.3d at 539; *see also Columbia Valley Healthcare*

22

*Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact, and the report is sufficient if it makes "'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460).

Applying the standard outlined above, we cannot say that Dr. Pisula's explanation fails to provide a sufficient preliminary link between Dr. Luu's alleged breach of the standard of care and Smith's injuries. *See Abshire*, 563 S.W.3d at 225. The report draws a line directly from Dr. Luu's failure to properly diagnose Smith's stroke and her alleged failure to initiate a code stroke protocol (which, among other things, could result in the administration of thrombolytics to improve neurological outcome), which Dr. Pisula opines then resulted in Smith no longer being a candidate for thrombolytic treatment to prevent the progression of her stroke. *Id.* Dr. Pisula's report ties his conclusion to the underlying facts—that Dr. Luu's failure to properly diagnose Smith's stroke and initiate a code stroke protocol proximately caused the delay in diagnosis of Smith's stroke, that Smith's damages could have been prevented or mitigated had she been timely diagnosed with an acute stroke and a code stroke protocol initiated promptly, and that she did not receive an accurate

23

diagnosis and neurology consult until two days after symptom onset, when she presented to another hospital's emergency department and appropriate symptom management began by initiating a code stroke protocol. *See id.* at 225-26. Dr. Pisula explains "to a reasonable degree, how and why the breach caused the injury based on the facts presented." *See Jelinek*, 328 S.W.3d at 539-40. Because Dr. Pisula explains the "how and why" Dr. Luu's breach of the standard of care caused Smith's injury, his use of terms "los[s] [of] opportunity" and "would have likely" do not render the report deficient. *See, e.g.*, *Monga v. Perez*, No. 14-16-00961-CV, 2018 Tex. App. LEXIS 627, at **35-36 (Tex. App.—Houston [14th Dist.] Jan. 23, 2018, pet. denied) (mem. op.) (concluding that expert report's use of terms such as "likely to occur" or "likely would not have occurred" did not amount to speculation and conjecture making the report deficient but instead was sufficient because the expert report did not use only words of mere possibility and explained "how and why" the defendant's breach of the standard of care caused the plaintiff's injuries). The expert report is not required to describe the causal relationship with "magical words[,]" but it must do more than express a mere possibility. *Bowie*, 79 S.W.3d at 53. The trial court could have reasonably rejected SLWH's position that Dr. Pisula's opinion on causation was speculation or conjecture.

As to SLWH's argument that SLWH cannot be vicariously liable in this case because Dr. Luu was not an employee of SLWH at the time of Smith's care and

SLWH did not train, educate, instruct, supervise or control Dr. Luu's medical decision making at the time of Smith's care, Chapter 74 does not require a plaintiff to provide an expert report that anticipates and rebuts all possible defensive theories that ultimately may later be presented at trial or by a dispositive motion for summary judgment. *See Monga*, 2018 Tex. App. LEXIS 627, at \*29 (citing *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.)). At this stage of the proceeding, we are not supposed to require a claimant to "present evidence in the report as if it were actually litigating the merits." *See Palacios*, 46 S.W.3d at 879. We cannot say that the trial court abused its discretion in reaching the conclusion that Dr. Pisula's second amended report constitutes a good faith effort to comply with the Act's requirement to provide a fair summary of his opinions with respect to the causal relationship between Dr. Luu's alleged breach and Smith's injury, and we cannot say that the amended report failed to inform SLWH of the specific conduct called into question or that it fails to provide a basis for the trial court to conclude the claims may have merit. *See Abshire*, 563 S.W.3d at 226 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6); *Palacios*, 46 S.W.3d at 879); *Baty*, 543 S.W.3d at 693-94.

We also cannot say the trial court abused its discretion in rejecting SLWH's suggestion that Smith's claim is nothing more than a "loss of chance" claim like the claim that was rejected in *Kramer*. *See* 858 S.W.2d 397, 400 (Tex. 1993); *see also*

25

*Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 859-62 (Tex. 2009) (addressing *Kramer* and explaining that the Texas Supreme Court has rejected the notion that the lost chance of survival or improved health is a distinct, compensable injury). This Court addressed a similar argument in *Deborah Rose Eezzuduemhoi, PLLC v. Delli*, No. 09-22-00053-CV, 2022 Tex. App. LEXIS 8452, at **18-19 (Tex. App.—Beaumont Nov. 17, 2022, no pet.) (mem. op.), and noted the following in concluding that the trial court in its discretion could have rejected the defendant's suggestion that the plaintiff's claims were nothing more than "lost chance" claims like what was rejected in *Kramer*:

> At this stage of the litigation, the plaintiff is not required to marshal all evidence, and "the expert need not prove the entire case or account for every known fact[]" as long as it is a good-faith effort to explain factually how the plaintiff will prove proximate cause. *Abshire*, 563 S.W.3d at 224 (citing *Zamarripa*, 526 S.W.3d at 460).

Accordingly, we overrule Appellant's issue, and we affirm the trial court's order.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on July 31, 2025
Opinion Delivered August 14, 2025

Before Golemon, C.J., Johnson and Wright, JJ.